UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| KEISUKE SUZUKI, | ) |
| | ) |
| *Plaintiff* | ) |
| | ) |
| v. | ) CIVIL ACTION NO. |
| | ) |
| ABIOMED, INC., | ) |
| | ) |
| *Defendant* | ) |

## COMPLAINT AND JURY DEMAND

## INTRODUCTION

1.    By this action, plaintiff Keisuke Suzuki ("Suzuki") seeks from Abiomed, Inc. ("Abiomed"), his former employer, legal redress for the harm resulting from Abiomed's bad faith termination of his employment, including the recovery of the value of the 20,000 shares in Abiomed common stock, currently worth approximately $ 2.1 million, which Suzuki would have received but for Abiomed's bad faith termination of him. Abiomed terminated Suzuki in clear violation of the express terms of the employment agreement in order to avoid issuing him the 20,000 shares and did so when it became clear that Suzuki was going to satisfy the incentive goal that would trigger the obligation to issue him the shares, namely, the regulatory approval for use in Japan of Abiomed's line of heart pumps. For five years, Suzuki had navigated the Japanese regulatory approval process on behalf of Abiomed and had cleared the final hurdle prior to formal approval by Japanese authorities. In May 2015, with the conclusion of a very favorable meeting with Japanese authorities, Abiomed saw that the eventual approval of the device was now inevitable and suddenly regarded Suzuki as being expendable. When Suzuki refused to give up his contractual rights to the incentive compensation he had been working for five years

towards, Abiomed terminated his employment, and received a huge financial windfall when the device was approved. In the alternative, Suzuki seeks the amount of the 20,000 shares proportionate to the high degree to which regulatory approval was advanced at the time of his termination. In addition, Suzuki seeks recovery for the blatant violation of the express terms of the employment agreement when Abiomed wrongfully terminated his employment without cause and without providing him 28-days' written notice as required by the agreement. Lastly, Suzuki seeks recovery under the anti-retaliation provisions of the Massachusetts Wage Act, M.G.L. c. 149, § 148A, based on Abiomed's termination of his employment in retaliation for his asserting his rights to the incentive compensation he had bargained for and which he had provided services in order to receive.

## PARTIES

2.      Suzuki is an individual residing in Sunnyvale, California.

3.      Abiomed is a Delaware corporation with a principal place of business in Danvers, Essex County, Massachusetts.

## VENUE AND JURISDICTION

4.      Subject matter jurisdiction is based on this court's diversity jurisdiction under 28 U.S.C. § 1332, given that the parties are citizens of different states and that the amount in controversy exceeds $75,000, exclusive of interest and costs.

5.      Venue is proper under 28 U.S.C. § 1391(b).

## FACTUAL ALLEGATIONS

6.      Suzuki has bachelors and master's degrees in bioengineering from the University of California at San Diego. He has worked as a manager or director in the medical device field since 1998, both in Japan and in the United States. From 1998 to 2006, he worked in Japan at

Guidant Japan, K.K., a Japanese subsidiary of a large medical device company, and, from 2004 to 2006, served on its Board of Directors and as its Executive Vice President and Chief Regulatory and Quality Officer. He speaks Japanese fluently.

7.      Abiomed is a publicly-traded company founded in 1981. It is a leading provider of temporary mechanical circulatory support devices, or heart pumps. It develops, manufactures, and markets various products related to the care of the heart, including its line of heart pumps called "Impella."

8.      In recent years, Abiomed's focus has been on expanding the use of and regulatory approval for its Impella line of products, including obtaining regulatory approval to sell the Impella product line in Japan.

9.      In or about January 2007, Suzuki established Kaye Suzuki Device Consulting, LLC ("Suzuki Consulting"), which provided consulting services, personally provided by Suzuki, to companies seeking to introduce medical devices into the Japanese market.

10.      Beginning in early 2009, through Suzuki Consulting, Suzuki began providing Abiomed with consultation services relating to its seeking approval in Japan of its Impella line of heart pumps. Such services included Suzuki consulting on the regulatory approval process in Japan and advocating the Impella technology to many key opinion leaders in the Japanese market, such as cardiologists. It also included his advocating the Impella technology with officials at Japan's Ministry of Health, Labour and Welfare ("MHLW") and Japan's Pharmaceutical and Medical Device Agency ("PMDA"), the two government agencies with regulatory authority in connection with the approval of the use and reimbursement of medical devices in the Japanese market, and also with United States Department of Commerce ("DOC") officials at the United States embassy in Japan.

11.     Suzuki charged Abiomed for his consulting services at the rate of $500 per hour.

12.     Suzuki, through Suzuki Consulting, also provided similar consultation services to many other organizations. Suzuki was earning approximately $500,000 dollars annually through Suzuki Consulting.

13.     In late 2009, Suzuki began having discussions with Abiomed's President and CEO, Michael Minogue ("Minogue"), and Abiomed's Vice President of Healthcare Solutions, Andrew Greenfield ("Greenfield"), about Suzuki becoming hired by Abiomed as a full-time employee. At the time, Abiomed was not profitable and Minogue and Greenfield expressed that they wanted to minimize Abiomed's expenses. During these discussions, Suzuki made clear that he was making approximately $500,000 per year through his consulting business and that he wanted to make at least the same for Abiomed, but would be willing to sacrifice short-term base salary for long-term incentive compensation. They discussed that Suzuki could be compensated by a combination of salary, bonuses, stock shares, and commissions. Suzuki indicated that he would accept a base salary of what his base salary had been at Guidant, $250,000 per year, if the bonuses, stock shares, and commissions would more than make up the difference.

14.     On April 1, 2010, Abiomed made a written offer of employment to Suzuki. Under the terms of the offer, Suzuki would become Abiomed's Vice President of Asia and would receive a base annual salary of $250,000, an annual bonus potential of up to $100,000, performance stock grants of up to 45,000 shares in Abiomed common stock that would be issued upon the achievement of certain set performance goals, and a commission opportunity of up to $1 million over a two-year period once the Impella devices became commercialized in Japan, that is, once the devices were approved for general use and for reimbursement by the government.

15.     At the time of the offer, the price for Abiomed's common stock was $10 per share.

16.     The offer letter specifically addressed Suzuki's potential for receiving commissions later on, stating that "[o]nce approval is gained for Impella General Use in Japan and provided that you remain and are qualified to be employed in the Commercial leadership role, we will present to you a commission structure" and that it is expected that it will "allow earnings of up to a maximum of $1,000,000" over a two-year period. If further provided that, once approval is gained and commercial sales have begun, Suzuki would no longer be eligible for the annual bonus plan but would convert to the commission structure.

17.     The offer letter also addressed Suzuki's potential for obtaining performance stock grants in the company, stating as follows:

> In addition to the foregoing, in order to provide you with specific incentives and rewards for achieving significant milestones along the path of competent authorities' approval in Japan, subject to the approval of the the (sic) Compensation Committee of the Company, the Company will issue you a performance share award under the Company's 2008 Stock Incentive Plan which will provide for the following:
>
> -       The issuance of 10,000 shares of Abiomed's common stock upon the successful submission of the Shonin application to the Japanese PMDA for Impella use in Japan.
>
> -       The issuance of 20,000 shares of Abiomed's common stock when the MHLW approves lmpella for general use. ·
>
> -       The issuance of 15,000 Shares of Abiomed's common stock when Approval for targeted reimbursement level of Impella is gained.
>
> This performance share award will require that you continue to be employed by the Company on the date that any of these milestones are achieved in order to be awarded the stock, and shall be subject to the terms and conditions of the 2008 Stock Incentive Plan and such other terms and conditions determined by the Compensation Committee that will be set forth in the corresponding performance share award agreement.

18.     While the base salary was half of what Suzuki was making through his consulting business, Suzuki relied on the offer's inclusion of bonus potential, incentive stock shares, and future commissions and accepted the offer on April 2, 2010, believing and expecting that Abiomed would carry out its obligations in good faith and would deal with him fairly.

19.     Upon accepting the offer, Suzuki ceased operating Suzuki Consulting and terminated his consulting relationships with his other consulting clients.

20.     A true and accurate copy of the signed offer letter, hereinafter referred to as the "Letter Agreement," is attached at Exhibit A.

21.     In further reliance upon Abiomed's representations and agreement, Suzuki moved from Yokohama, Japan to Marblehead, Massachusetts, purchasing a home there and, later, moving his wife and son there.

22.     Suzuki commenced working for Abiomed as Vice President of Asia on or about April 9, 2010.

23.     On April 10, 2010, he was presented with another agreement, entitled "Employment, Nondisclosure and Non Competition Agreement," hereinafter referred to as the "Nondisclosure Agreement," which he signed that day. A true copy of the Nondisclosure Agreement is attached hereto at Exhibit B.

24.     The Nondisclosure Agreement contained nondisclosure and non-competition provisions. It also provided Suzuki protections against being terminated without cause, providing that, after six months of employment, he could only be terminated without cause upon 28 days' written notice.

25.     While the Nondisclosure Agreement contains language suggesting that it superseded all prior agreements, it was agreed and understood by the parties, as confirmed by

6

their subsequent conduct, that the Nondisclosure Agreement complemented, and did not supersede, the terms of the Letter Agreement.

26.      The Letter Agreement and the Nondisclosure Agreement together comprise Suzuki's employment agreement with Abiomed and will be collectively referred to as the "Employment Agreement."

27.      In accordance with the Letter Agreement, on April 29, 2010, Abiomed granted three awards of Performance Shares, one for 10,000 shares, one for 20,000 shares, and the third for 15,000 shares. The written notice provided that the award was subject to the plan and the "award agreement" The award agreement was the Letter Agreement. Accordingly, the 45,000 shares would not vest or issue until the achievement of the goals in the Letter Agreement.

28.      At the time Suzuki started working for Abiomed as an employee, his work advocating the Impella technology was such that officials at the MHLW had recommended to him that Abiomed should arrange for the relevant physician societies in Japan to file a petition with MHLW for so-called "fast track" approval of Impella as it was able to meet unmet clinical needs in Japan. Being recommended for fast track approval was very rare and, if successful, could result in approval within about two years.

29.      However, Suzuki soon learned that Abiomed had misrepresented both the state of things at Abiomed and its level of commitment to having the Impella gain approval in Japan, such that approval in two years was not realistic.

30.      Prior to becoming an employee, Suzuki had visited Abiomed's headquarters in Danvers, Massachusetts and met with the relevant vice presidents and they had indicated that the bench data and the clinical data on the Impella was very strong and that their only concerns related to the biocompatibility data and the animal experimental data.

31.     However, after beginning work as an employee for Abiomed, Suzuki soon learned that the bench data and the clinical data for the Impella was not strong and would face many challenges to gain approved by the Japanese authorities.

32.     For instance, Abiomed wanted to use the summary report and the underlying report for the bench testing which had been submitted to the federal Food and Drug Administration ("FDA"). Abiomed's Regulatory Affairs ("RA") division drafted a summary report, based on the summary report which had been submitted to the FDA but which followed Suzuki's format for submission to the Japanese authorities, without showing Suzuki the underlying report. After much insistence, Suzuki obtained the underlying report and learned that the summary report, like the summary report that had been submitted to the FDA, was very misleading and had numerous discrepancies from the underlying report. For instance, the underlying report showed that Abiomed had changed the acceptance criteria of tests such that a failing test was determined, after the fact, to be a passing test. Also, many of the reports referenced older reports. None of the reports were based on testing done all at once but the summary report did not show this.

33.     Suzuki requested new testing and that request was rejected.

34.     With respect to the risk analysis information that needed to be submitted, Abiomed wanted to rely on the risk analysis report which had been submitted to the FDA. However, this report was very superficial and would clearly not be acceptable to the Japanese authorities. The biocompatibility test results done in connection with the FDA submissions also had glaring issues. Some of the tests had to be redone. Also, some of the raw materials used were not medical grade. The animal test data also showed a significant amount of issues, as alarms kept going off during testing. The human data report was of low quality. Suzuki requested that

audits be conducted on the underlying raw data and whether the methodology met with good clinical practice ("GCP") and that a new, more extensive report be generated. Abiomed rejected these requests.

35.     While MHLW had advised Suzuki, as of the time he became an employee, that Abiomed should submit its application for approval by August 2010, it was soon clear to Suzuki that, due to the various problems with the underlying testing and reports, this was not realistic.

36.     Suzuki did work on the petition for approval by the physician societies and that petition, jointly submitted by the two leading cardiologist societies in Japan, passed preliminary approval.

37.     The MHLW then advised Suzuki that Abiomed should not submit its application for approval until after the MHLW committee on "fast track" approval conducted a full evaluation on the physician petition.

38.     While Suzuki recommended this approach to Minogue and Greenfield, Abiomed rejected it and submitted its application in March 2011.

39.     In accordance with the Letter Agreement, on March 31, 2011, Abiomed issued Suzuki 10,000 shares of common stock due to the first incentive goal having been achieved. As the stock was trading at $14.53 per share, the total value to Suzuki was $145,300.

40.     Despite the delays and Abiomed not following their recommendations, MHLW and PMDA were still willing to work with Abiomed. PMDA invited representatives of Abiomed, including Suzuki, to a "kick-off" meeting much earlier than expected. After the meeting, which occurred in about June 2011, it presented Abiomed with hundreds of questions that it requested Abiomed answer by September 30, 2011.

41.     Due to a lack of commitment by Abiomed to devote its resources to responding to the questions, Abiomed failed to submit its answers until approximately one year later. In the meantime, there had been turnover at both the MHLW and the PMDA and the passage of time greatly diminished Abiomed's prospects for obtaining fast track approval.

42.     Instead of focusing on gaining approval in Japan, Abiomed was focused on fixing various problems with the Impella device that had arisen, including that sometimes it would stop running after a couple hours, and in managing an ongoing human clinical study called Protect II. Upon information and belief, none of the other executives at Abiomed, with the exception of Minogue, had a compensation incentive tied to gaining approval in Japan and, as a result, Japan never became a priority.

43.     Suzuki continued working on having the Impella line of devices be approved for general use in Japan. However, Abiomed continued not to devote the necessary resources to this. Also, there continued to be major problems with the testing which had been performed and with the reports of such testing. Suzuki made numerous requests for re-testing, most of which were rejected by Greenfield and/or Minogue. Abiomed's attitude was to have Suzuki submit reports based on its FDA submissions, despite the problems in such submissions, and not to re-test unless specifically requested by the Japanese authorities. In doing this, Abiomed was refusing to follow Suzuki's advice based on his knowledge of the Japanese regulatory approval process and the higher scrutiny and different requirements imposed.

44.     In addition to working on regulatory approval, Suzuki's duties also included preparing the Japanese market for entry. He arranged for physician presentations to groups of Japanese cardiologists. While initially very few cardiologists were interested in the product, by

2015, Suzuki's work in promoting interest in the product had resulted in his arranging presentations where hundreds of physicians would attend.

45.     By the summer of 2014, progress on obtaining regulatory approval on Impella in Japan had stalled.

46.     In March or April 2015, through Suzuki's efforts, Abiomed was able to acquire a meeting between Abiomed representatives and officials at PMDA. For PMDA to grant such a meeting was highly unusual and of great benefit to Abiomed.

47.     This meeting occurred in early May 2015. This meeting was very favorable to Abiomed. While there had been concerns within Abiomed that Impella would not be approved without Abiomed first conducting a costly and time-consuming human study in Japan, PMDA made clear at this meeting that it would not be requiring such a study. In addition, PMDA made clear that it was prepared to approve the Impella for general use once Abiomed submitted updated reports addressing the four major modifications to the device which had occurred since the initial application.

48.     Abiomed was very pleased with this meeting. At this point, while Japan's approval would not be immediate, Abiomed regarded it as a certainty that Japan would approve Impella once Abiomed submitted the requested reports on the modifications to the Impella. Abiomed had submitted Premarket Approval ("PMA") application including these four modifications to the FDA and it believed that it could use such reports as a basis for the reports that would be submitted to Japan.

49.     At this point, Suzuki's perceived value to Abiomed greatly dropped. His expertise, experience, and connections in Japan had helped guide Abiomed down the path to entering a very difficult market where regulatory was now regarded as a virtual certainty.

11

50.     In addition to shepherding the application through the Japanese regulatory authorities, Suzuki had also created Abiomed's new Japanese subsidiary and had set up and staffed its office in Japan and had generated significant interest in the device among Japan's cardiologists.

51.     Abiomed recognized that, if Suzuki continued working for it through the time of Japan's eventual approval, Abiomed would then be required to issue Suzuki an additional 20,000 shares of its common stock. Due to the appreciation in the value of the stock, the 20,000 shares were then valued at approximately $1.3 million.

52.     Abiomed further recognized that, once approval and reimbursement issued, Suzuki would receive an additional 15,000 shares of common stock and start receiving commissions on Impella sales of up to $1 million over two years.

53.     Recognizing that Suzuki would be in position for a very large financial reward and desiring not to have to pay him these benefits, Abiomed decided to change the terms of his compensation so as to take away his stock rights and future commission rights.

54.     In making this decision, Abiomed was well aware that Suzuki's base compensation was well below his market value, that he had taken the job at Abiomed due to the incentive stock and commission components of his compensation package, and that Suzuki's performance over five years had made it inevitable that Suzuki's would meet the second and third incentive goals set forth in the Letter Agreement.

55.     To create a false justification for taking away such rights, Abiomed decided to give Suzuki a falsely negative job performance, deny him his annual bonus, and diminish his role in the company.

56.     Up until this point, Suzuki consistently received favorable performance evaluations and had received performance bonuses and raises each year. Specifically, he received bonuses of $80,000 or $90,000 each year and his base annual salary had increased each year so that it was $271,800 in 2015.

57.     On May 14, 2015, Greenfield met with Suzuki and discussed changing his duties and compensation structure, during which Suzuki indicated that he was not happy with any decrease in his compensation or duties.

58.     On May 20, 2015, Greenfield followed-up this discussion by providing Suzuki with a proposed amendment to the Offer Letter in the form of a letter entitled "Amendment to Offer Letter Dated April 1, 2010" (the "Proposed Amendment"). A true copy of the Proposed Amendment is attached at Exhibit C.

59.     During this meeting, Greenfield also provided Suzuki with a falsely negative performance review, giving him an overall rating of "Marginal," meaning that he was not meeting the requirements of his position. This was the first negative performance review Suzuki had ever received. Greenfield also made clear that Suzuki would not be receiving any bonus. This was the first time he was not going to receive a bonus of at least $80,000.

60.     The Proposed Amendment, if accepted by Suzuki, would have amended the Letter Agreement. Under it, Suzuki's duties would be limited to Japan, not the rest of Asia. As a practical matter, this would not change his duties as, up to that point, his focus had been almost entirely on Japan. While his goals would continue to include formal MHLW approval for the Impella line, all prior outstanding performance-related milestones would be terminated and the 35,000 remaining Performance Share awards granted under the Letter Agreement would be cancelled. Instead of receiving Performance Shares, Suzuki would receive Restricted Stock Units

("RSUs") in significantly lower amounts and at much lesser value. Specifically, Suzuki would receive 10,000 RSUs when MHLW approved Impella for general use, with 5,000 vesting at the time of approval and the remainder vesting one year later, and he would receive 5,000 RSUs upon Japan's approval of targeted reimbursement level of Impella, with 2,500 RSUs vesting at the time of approval and the remainder vesting one year later. Moreover, the change from Performance Shares to RSUs would be particularly detrimental to Suzuki as, under Abiomed's stock incentive plan, Suzuki would not be granted any shares but would simply have the right to purchase these shares in an amount later determined by the Compensation Committee. Similarly, the Proposed Amendment provided that Suzuki's entitlement to commissions would be cancelled outright.

61.     Suzuki rejected the Proposed Amendment.

62.     Abiomed then revised the proposed amendment, providing him, on May 22, 2015, with another proposed amendment (the "Revised Proposed Amendment"). A true copy is attached at Exhibit D. The Revised Proposed Amendment was even more unfavorable to Suzuki, essentially keeping the original Proposed Amendment the same except that it lowered the potential awards of RSUs from an aggregate of 15,000 to an aggregate to 7,500.

63.     Suzuki rejected the Revised Proposed Amendment and submitted a written statement on May 26, 2015 explaining his decision. In this document, Suzuki specifically pointed out that cancelling his potential commission would not be fair nor make sense as his commissions were to be based on the sale of the Impella products after approval and that, under the proposed amendments, he was to continue working for approval of the Impella in Japan. That is, by narrowing the scope of his duties from all of Asia to Japan only, the bargained-for commission based on the sales of the products in Japan should not change. He also pointed out

14

that the company was being hypocritical for ostensibly reducing his role due to his claimed failure to obtain regulatory approval in Japan but allowing him to continue in that role and only reducing his other roles. He pointed out that the "whole purpose is not about needing to change after 5 years, but more about not wanting to keep the original deal between [him] and [Abiomed], as the value of the equity have risen far beyond what the company foreseen (sic) at that time." He also pointed out that Abiomed's purpose was "apparent as the company does not want to change [his] salary but only the equity and commission portion only." He also noted that he did want to continue to gain regulatory and reimbursement approval and that, if Abiomed wanted to stop him from obtaining commissions on sales after that, it could terminate him after approval was gained. He finished by stating that Abiomed's only desire to change now was because Abiomed wanted to change the deal on the equity awards.

64.     In response, on June 18, 2015, Abiomed terminated his employment without cause.

65.     Moreover, in a blatant breach of the Nondisclosure Agreement, Abiomed failed to provide Suzuki with 28-day notice of such termination as required. Moreover, it failed to pay him compensation for the 28 days. Instead, Suzuki was directed to leave the premises immediately.

66.     At the time he was notified of his termination, Abiomed provided Suzuki with a proposed Severance Agreement and Release (the "Proposed Severance Agreement"). Consistent with the severance pay obligation under the Letter Agreement, Abiomed offered severance pay of six months' base salary in exchange for a full release. Abiomed gave Suzuki 40 days to accept the offer. Suzuki never accepted the offer and, per its terms, it was rejected.

67.     At the time of Suzuki's termination, the price of Abiomed's common stock was $67.16 per share such that the value of 20,000 shares was $1,343,200.

68.     After terminating Suzuki, Abiomed failed to devote sufficient resources to obtaining regularly authority in Japan. If Suzuki had continued working for Abiomed, approval would likely have occurred within six to nine months.

69.     On September 27, Abiomed's Impella line of heart pumps received PMDA approval from the MHLW for general use in Japan.

70.     As CEO Minogue said during an October 27, 2016 earnings call, "This quarter's historic achievement with Japanese PMDA approval reflects years of regulatory execution."

71.     At the time of this Complaint, November 1, 2016, the price of Abiomed's common stock is $104.99 per share, such that the current value of 20,000 shares in Abiomed common stock is $2,099,800.

## COUNT I
### Breach of Contract, including Breach of the Implied Covenant of Good Faith and Fair Dealing

72.     Suzuki repeats all previous allegations as though set forth herein.

73.     Suzuki and Abiomed entered into two written agreements, the Letter Agreement and the Nondisclosure Agreement, which together comprise the Employment Agreement. The Employment Agreement is a legal contract supported by adequate consideration.

74.     Under the Employment Agreement, Abiomed implicitly agreed that it would carry out its obligations and enforce its rights under it in good faith and fairly. This is because every contract in Massachusetts is subject to an implied covenant of good faith and fair dealing. The purpose of the implied covenant is to ensure that neither party interferes with the ability of the other party to enjoy the fruits of the contact and that, when performing its obligations of the

contract, the parties remain faithful to the intended and agreed expectations of the contract. A breach occurs when one party violates the reasonable expectations of the other.

75.     An employer is liable for a breach of the covenant of good faith and fair dealing if it terminates an employee (1) in bad faith by seeking to deprive him of a commission due or about to be due or (2) without good cause resulting in the loss of compensation related to the employee's past services.

76.     Under the Employment Agreement, Abiomed was required to issue 20,000 shares of common stock to Suzuki upon Japan approving Impella for general use and was required to issue 15,000 more shares and start paying Suzuki commissions, of up to $1 million over two years, when Japan approved Impella for reimbursement by the government.

77.     Under the Employment Agreement, Suzuki was not an at-will employee but could only be terminated without cause if Abiomed first provided him 28 days' written notice.

78.     By May 2015, as a result of Suzuki's efforts over five years, it became clear to Abiomed that the Japanese authorities would approve the Impella line of products for general use.

79.     Recognizing that such approval would trigger and lead to costly obligations to Suzuki under the Employment Agreement, Abiomed decided to demand that Suzuki give up his stock rights and future commission rights under the Employment Agreement.

80.     When Suzuki refused to give up his bargained-for rights, Abiomed terminated him without cause or notice.

81.     At that point in time, Suzuki's future right to be paid the incentive stock shares, particularly the 20,000 shares due upon general approval in Japan, and the commissions, largely

related to his past services, as his services to date had resulted in Abiomed clearing all major

hurdles for approval such that Abiomed now regarded approval as inevitable.

82.    In demanding that Suzuki give up his rights to the shares and commissions,

Abiomed proceeded in bad faith, falsely claiming that the reductions in compensation were the

result of a change in duties. However, the change in duties was a pretext and the proposed

reductions in compensation had nothing to do with the change in duties, as all the proposed

reductions in compensation related to his work on obtaining regulatory approval in Japan,

something which Suzuki would continue doing.

83.    In fact, the principal reason why Abiomed sought a change in the terms of the

Letter Agreement, and then terminated Suzuki when he refused to agree to the proposed changes,

was to deny Suzuki the additional bargained-for incentive compensation which his services to

date had earned and which Abiomed would formally become obligated to pay once Japan

formally approved the product for general use. Such incentive compensation clearly related to his

services already provided.

84.    Abiomed's termination of Suzuki was in bad faith, as it was done to deprive him

of compensation he had earned or, at least, which related to his past services. It was also done in

bad faith as it was done in express breach of the Employment Agreement, as Abiomed had no

right under the agreement to terminate Suzuki without cause and without notice.

85.    By terminating Suzuki before the Japanese authorities formally approved Impella,

Abiomed avoided paying Suzuki compensation relating to his past services, resulting in a

financial windfall to Abiomed.

86.     Abiomed breached the express terms of the Employment Agreement when it terminated Suzuki without cause and without notice and when it failed to pay him 28 days of base compensation.

87.     Abiomed breached the implied covenant of good faith and fair dealing when it: (1) provided him a falsely negative performance evaluation done in a bad faith effort to justify a pretextual job demotion and change the terms of his compensation; (2) demanded that he give up his rights to receive 35,000 shares in Abiomed upon the achievement of certain goals, 20,000 of which were virtually certain to issue as regulatory approval in Japan was all but inevitable thanks to Suzuki's past efforts; (3) demanded that he give up his rights to receive commissions of up to $1 million over two years on sales of the Impella product in Japan; and (4) terminated Suzuki's employment when he refused these demands.

88.     If Abiomed had proceeded in good faith and had treated Suzuki fairly, Suzuki would have at least continued working at Abiomed through at least the approval of Impella, which would have resulted in his receiving 20,000 shares, and he would be in position to receive an additional 15,000 shares and commissions up to $1 million over two years.

WHEREFORE, Suzuki requests judgment enter against Abiomed in the amount of Suzuki's damages resulting from Abiomed's material breaches of the Employment Agreement, including its breaches of the implied covenant of good faith and fair dealing, plus interest and costs, plus any other relief the Court deems proper.

## COUNT II
### Promissory Estoppel

89.     Suzuki repeats all previous allegations as though set forth herein.

90.     In order to induce Suzuki to close his business and accept employment with Abiomed at a much lower salary than the compensation he was presently making in his own

company, Abiomed promised Suzuki that it would pay him additional incentive compensation, including performance shares based on the achievement of certain performance goals and commissions once the product was approved.

91.     In addition, Abiomed promised that it would devote sufficient resources to Suzuki reaching such goals and represented that the state of its testing was much more favorable than it actually was.

92.     Reasonably relying on such promises, Suzuki decided to close his business and go work for Abiomed and to accept a yearly base salary half of what his yearly compensation was.

93.     Abiomed reasonably expected that these promises would induce Suzuki to go work for Abiomed and to then continue working for Abiomed.

94.     Through his services, Suzuki caused Abiomed to be in positon where regulatory approval in Japan was inevitable and, relatively speaking, imminent, which would trigger Suzuki receiving the incentive compensation which was an important reason why he decided to go work for Abiomed.

95.     In order to avoid injustice, Abiomed's promises should be enforced and Suzuki should receive all that he would have received if he had been allowed to continue through Japan's regulatory approval of the Impella line, at least including the issuance of 20,000 shares of common stock (or the market value of such shares as of the date of this Complaint) or, in the alternative, a lesser amount of shares and compensation representing the fair value of the services he performed for Abiomed.

WHEREFORE, Suzuki requests judgment enter Abiomed in the amount of his compensatory damages, plus interest and costs, plus any other relief the Court deems proper.

## COUNT III
## Quantum Meruit

96.     Suzuki repeats all previous allegations as though set forth herein.

97.     Reasonably relying on such promises described above, Suzuki decided to close his business and go work at Abiomed at a salary much lower than what he was making in his business.

98.     By terminating Suzuki's employment at a time when it had become apparent that regulatory approval was going to happen but before the regulatory approval goal was formally and technically met, Abiomed has retained the value of Suzuki's services that exceed the amount of his salary and bonuses and which is at least the value of the 20,000 shares in Abiomed stock which would have issued upon approval.

WHEREFORE, Suzuki requests that this Court order Abiomed to pay Suzuki an amount which fairly compensates him for the value of his work which he provided in reliance of the promises described above that exceeds the compensation he actually received, plus interest and costs.

## COUNT IV
## Wage Act Retaliation Claim – M.G.L. c. 149, § 148A

99.     Suzuki repeats all previous allegations as though set forth herein.

100.    Suzuki has satisfied all prerequisites to suit under M.G.L. c. 149, § 148.

101.    Abiomed was Suzuki's "employer" within the meaning of M.G.L. c. 149, § 148.

102.    Pursuant to M.G.L. c. 149, § 148A, an "employer" within the meaning of M.G.L. c. 149, § 148 is prohibited from penalizing an employee in any way "as a result of any action on the part of an employee to seek his or her rights under the wages and hours provisions" of M.G.L. c. 149.

103.    Plaintiff refused to give up his rights to commissions and performance stock shares.

104.    Plaintiff, in good faith, believed that he had already earned most if not all of the value of his stock incentive rights and commission rights, having labored for five years to obtain regulatory approval in Japan and with the Japanese authorities making clear that it was prepared to grant approval upon submission of certain information concerning some interim improvements to the product.

105.    Plaintiff's refusal to agree to Abiomed's demands was done in a good faith belief that he had already earned most if not all his incentive compensation and constituted an exercise of his rights under M.G.L. c. 149.

106.    Abiomed retaliated against Suzuki due to his good faith exercise of his rights under M.G.L. c. 149.

107.    If Abiomed had not retaliated against him for his refusing to give up his compensation rights, Suzuki would have continued working at Abiomed and would have continued to receiving his salary, and would have received the benefits of his performance stock shares and commissions.

108.    Such conduct by Abiomed violates M.G.L. c. 149, § 148A and, pursuant to M.G.L. c. 149, § 150, Abiomed is liable to Suzuki in the amount of three times the amount of all damages he has suffered and will continue to suffer as a result of such retaliatory actions, plus interest and costs, and reasonable attorney's fees.

WHEREFORE, Suzuki demands judgment enter against Abiomed in the amount of three times the amount of his compensatory damages from Abiomed's retaliatory conduct, plus his

reasonable counsel fees, plus interest and costs, and such other relief as the Court deems just and

proper.

        PLAINTIFF HEREBY DEMANDS A JURY ON ALL CLAIMS SO TRIABLE.

                  Respectfully Submitted,

                  KEISUKE SUZUKI,
                  By his attorney,

                  */s/ William T. Harrington*
                  William T. Harrington (BBO No 564445)
                  171 Milk Street, 2nd Floor
                  Boston, MA 02109
                  (617) 426-7400
                  wharringtonlaw@gmail.com

Dated:  November 1, 2016