UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

_____
                                        )
KEISUKE SUZUKI,                         )
                                        )
            Plaintiff,                   )
                                        )
      v.                                 )        Civil Action No. 1:16-CV-12214-DJC
                                        )
ABIOMED, INC.,                          )
                                        )
            Defendant.                   )
_____)

## ABIOMED, INC.'S MEMORANDUM IN SUPPORT OF MOTION TO DISMISS

Pursuant to Fed. R. Civ. P. 12(b)(6), Defendant Abiomed, Inc. ("Defendant" or "Abiomed") submits this Memorandum in support of its Motion to Dismiss (the "Motion") the Complaint (the "Complaint") filed by Abiomed's former Vice President of Asia, Keisuke Suzuki ("Plaintiff" or "Suzuki").  Plaintiff's fundamental contention—and the Complaint's irreparable flaw—is that although he admittedly was terminated more than *15 months before* Abiomed obtained approval from Japanese regulatory authorities for general use of its Impella® heart pump device, he nevertheless somehow is entitled to certain incentive shares and an opportunity to earn commissions, both of which were dependent on achieving such approval *while he was employed.*  Plaintiff's own Complaint affirms that the conditions precedent for his earning the incentive shares or becoming subject to a commission plan did not occur.  The remainder of Plaintiff's Complaint fails to allege any independent facts—as opposed to conclusions—that plausibly suggest that he is entitled to the equity or commissions under any other theory.  As such, Plaintiff's Complaint must be dismissed in its entirety under Rule 12(b)(6).

More particularly:

• As to Count I (breach of contract/breach of the implied covenant of good faith and fair dealing), Plaintiff relies on the 2010 Offer Letter, which memorialized the terms of his employment. This document unambiguously provides that (1) his entitlement to three sets of incentive shares was dependent on his achieving three sets of specified goals (of which the second was attaining regulatory approval in Japan), as well as remaining employed through the date each goal was achieved; and (2) if regulatory approval were achieved and Suzuki remained employed in an eligible position, the Company "would present" a commission plan that it "expected" would "allow earnings of up to a maximum of $1,000,000.00 . . . ." Notably, Plaintiff acknowledges that he received the first set of shares after he achieved the first goal (submission of the regulatory application). As to the remaining goals, his Complaint admits that his employment terminated nearly a year and a half before regulatory approval by the Japanese authorities was achieved. Undeterred, Plaintiff asserts that regulatory approval had become "inevitable" by the time of his termination, and therefore, the remaining incentive shares and commissions were "earned compensation" for his past services. He therefore asserts that Abiomed breached the implied covenant of good faith and fair dealing when his employment was terminated.

These allegations fail to identify a plausible breach of contract/breach of implied covenant claim because the Complaint does not—and cannot—identify *facts* reflecting that Suzuki had already earned the equity or any commissions at the time of his termination; that is, that such amounts were compensation that was due to him for his *past* services. To the contrary, the Complaint acknowledges that even if he had remained employed, Plaintiff would have had to provide further services for *an additional six to nine months* in order to obtain approval in Japan, and further confirms that in fact, approval was not achieved for over 15 months after his departure. Because the Complaint fails to allege that Suzuki did more than "lay the groundwork" for the achievement of approval in Japan, this claim fails as a matter of law.

• As to Count II (promissory estoppel), Suzuki claims that he accepted the position with a lower salary than he previously earned based on promises of incentive shares and the possibility of commissions, conditional on meeting certain goals, and "sufficient resources" to attain regulatory approval. The Complaint alleges that he reasonably relied on these "promises," and that since his work made approval "inevitable" and "relatively speaking imminent," it would be unjust to deny him the incentive shares. This theory fails from the get-go, as promissory estoppel is not a viable theory here where there was a valid underlying contract that covers the very same subject matter. Moreover, the alleged promises are superseded by the explicit terms of the 2010 Offer Letter (providing for conditions that he did not meet), or otherwise are too vague to create *reasonable* reliance as a matter of law.

• Count III (quantum meruit) relies on largely the same allegations, and likewise fails for substantially the same reasons, namely that the theory is inapplicable where a valid agreement covers the same subject matter, and where Plaintiff's own Complaint admits that he had not "conferred the benefit" of achieving the regulatory approval prior to his termination.

- As to Count IV (retaliation under the Massachusetts Wage Act, Mass. Gen. Laws ch. 149, § 148), Plaintiff purports to assert a retaliation claim based on his rejection of the proposed ***prospective*** changes to his compensation arrangement.  This claim fails because the allegations of the Complaint reflect that Plaintiff's conduct did not involve protesting the denial of wages then due and owing to him.  Moreover, it is well established that the forms of ***contingent compensation*** at issue here are outside the scope of the Wage Act.  As such, this claim, too, must be dismissed.

### SUMMARY OF RELEVANT FACTS PLED IN THE COMPLAINT[1]

Founded in 1981, Abiomed is a leading provider of temporary mechanical circulatory support devices, known as "heart pumps."  Compl. ¶ 7.  Among other things, the Company develops, manufactures, and markets its line of heart pumps called "Impella."  Id.  In the timeframe relevant to the Complaint, Abiomed sought to obtain regulatory approval to sell the Impella line of products in Japan.  Compl.  ¶ 8.

Immediately prior to joining Abiomed in April 2010, Suzuki was the principal of his own consulting business, purportedly earning approximately $500,000 dollars annually.  Compl. ¶¶ 10, 12.  During discussions with Abiomed about Suzuki's potential engagement as an employee of the Company, Suzuki informed Abiomed of his approximate annual earnings, and reflected that he would be willing to accept a salary of $250,000 per year if the additional contemplated bonuses, stock shares, and commissions would exceed the difference.  Compl. ¶ 13.

By letter dated April 1, 2010, Abiomed offered Suzuki employment as Vice President of Asia, with an annual salary of $250,000 and annual bonus potential of up to $100,000.  Compl. ¶ 14 and Exhibit A (the "2010 Offer Letter").  The 2010 Offer Letter also reflected that Suzuki would be awarded up to 45,000 shares of Abiomed common stock to be issued in three

---

[1] Solely for purposes of this Motion to Dismiss, Abiomed accepts as true the allegations in the Complaint.

installments contingent on achievement of three specified performance goals.[2]  The share award was explicitly conditioned on Suzuki "***continu[ing] to be employed by the Company on the date that any of the[] milestones are achieved* . . . .**"  Id. ¶ 17 and Ex. A.  The 2010 Offer Letter also stated that "[o]nce approval is gained for Impella General Use in Japan and provided that you remain and are qualified to be employed in the Commercial leadership role, we will present to you a commission structure," and that Abiomed expected the plan to "allow earnings of up to a maximum of $1,000,000 USD" over two years.  Ex. A; see also Compl. ¶ 14.  Though not stated in the Complaint, the 2010 Offer Letter states: "ABIOMED, of course, ***reserves the right on a prospective basis to modify, change or eliminate its Compensation, Bonus or Benefit programs, at the Company's sole discretion.***"  Ex. A at 2.  Further, though also not noted in the Complaint, the 2010 Offer Letter provided that Plaintiff was employed at will, stating that there was no obligation to employ Suzuki "for any stated term," and both parties "remain free to end the employment relationship at any time for any reason."  Id.  Lastly, also not cited to is the integration provision, stating that "this letter constitutes our entire offer regarding the terms and conditions of your employment by ABIOMED and it supersedes any prior agreements, or other promises or statements (whether oral or written) regarding the offered terms of employment."  Ex. A at 3.  Shortly after, Suzuki signed the Employment, Nondisclosure and Non-Competition Agreement ("NCA"), which imposed on him certain nondisclosure and non-competition provisions, and provided that after six months of employment, Suzuki could be terminated

---

[2] The performance goals attendant to the share award were as follows:  (1) 10,000 shares would issue "upon the successful submission of [an application to a Japanese regulatory agency] for Impella use in Japan."; (2) 20,000 shares would issue "when [another Japanese regulatory agency] approves Impella for general use"; and (3) 15,000 shares would issue "when Approval for targeted reimbursement level of Impella is gained."  Ex. A at p. 2.

without cause upon 28 days' written notice (or with cause at any time).  Exhibit B; see also Compl. ¶¶ 23-24.

Plaintiff alleges that he accepted the offer with the purportedly lower salary and moved to the U.S. with his family in reliance on Abiomed's "inclusion of bonus potential, incentive stock shares, and future commission" based on meeting the stated goals, its promise to "devote sufficient resources" to achieving those goals, and its statements about the state of its testing. Compl. ¶¶ 18, 21, 91.

On April 29, 2010, Abiomed granted Suzuki three awards of Performance Shares, none of which were to vest or issue until achievement of each milestone stated in the 2010 Offer Letter.  Compl. ¶ 27.  On March 31, 2011, Abiomed issued 10,000 shares of common stock as a result of the achievement of the first milestone.  Compl. ¶ 9.  The remaining two milestones were not met during Plaintiff's employment, and no further incentive shares were issued.  See generally Compl. ¶¶ 64, 69.

The Complaint alleges that after starting work, Suzuki learned that contrary to Abiomed's representations its data was "not strong and would face many challenges to gain [approval] by the Japanese authorities."  Compl. ¶ 31.  Suzuki also alleges that "Abiomed promised that it would devote sufficient resources to Suzuki reaching [the stated] goals and represented that the state of its testing was much more favorable than it actually was."  Compl. ¶ 91.  Suzuki avers that in the following years he worked to obtain Impella regulatory approval in Japan, and asserts that Abiomed took certain actions, including not taking his advice or acceding to certain of his requests.  See generally Compl. ¶¶ 32-38, 40-47, 50.  Nevertheless, Suzuki alleges that as of May 2015, following a meeting with representatives of one of the Japanese regulatory bodies, approval in Japan became "inevitable," though it would not be "immediate," but later admits that

such approval was not achieved until September 27 (2016), over 15 months later.  Compl. ¶¶ 54, 48, 69.

The Complaint asserts that after the May meeting, Suzuki was told that he was not meeting the expectations of his position, and that for the first time he received an unfavorable review and was denied an annual bonus, which previously had ranged between $80,000 and $90,000.  Compl. ¶¶ 56, 59.[3]  He was also provided with two amendments to his 2010 Offer Letter which proposed to limit his duties to Japan, terminate his prior outstanding milestones, cancel the remaining (not yet issued) Performance Shares in favor of providing Restricted Stock Units (RSUs) in lower amounts, and thus lesser values, and omit commissions from compensation going forward.  Compl. ¶ 60.

On May 26, 2015, Suzuki submitted to Abiomed a written statement rejecting the proposed changes because, in part, "cancelling his potential commission would not be fair or make sense . . . ."  Compl. ¶ 63.  He added that he believed the Company was seeking to "change the deal on the equity awards," because their value had increased significantly over the prior five years.  Id.  Plaintiff's employment was terminated on June 18, 2015, without cause and without 28 days' notice or compensation in lieu of the same.  Compl. ¶¶ 64-65.[4]

---

[3] Of note, he does not claim any entitlement to this bonus.

[4] Following his termination Suzuki, through counsel, sent a demand letter to Abiomed.  Counsel for Abiomed responded in a letter reflecting that the allegations contained in the demand so wholly lacked foundation in fact and law as to be subject to sanctions under Rule 11 of the Rules of Civil Procedure.  Suzuki apparently obtained new counsel who, approximately a year later, sent a new demand letter, attaching a draft complaint (which was substantially similar to the present Complaint).  Abiomed's counsel again responded in a communication that reflected that the claims were specious and remained subject to Rule 11 sanctions.  Nevertheless, in November 2016, Suzuki filed the present Complaint.

## ANALYSIS

When considering a motion to dismiss under Fed. R. Civ. P. 12(b)(6), the Court must assess the Complaint in two steps.  First, "conclusory allegations that merely parrot the relevant legal standard are disregarded, as they are not entitled to the presumption of truth."  Manning v. Boston Medical Center Corp., 725 F.3d 34, 43 (1st Cir. 2013).  Second, after "accept[ing] the remaining factual allegations as true," the Court must decide if, "drawing all reasonable inferences in Plaintiff's favor, they are sufficient to show an entitlement to relief."  Id.  The factual allegations must make the claim "plausible," not "merely consistent" with liability.  Id., quoting Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).  Dismissal is appropriate if the well-pleaded facts do not "possess enough heft to show that plaintiff is entitled to relief."  Ruiz Rivera v. Pfizer Pharm., LLC, 521 F.3d 76, 84 (1st Cir. 2008) (quotations and original alterations omitted).

## I.   The Claim of Breach of the Implied Covenant of Good Faith and Fair Dealing Fails As a Matter of Law.

Apparently conceding that there was no breach of the plain terms of the 2010 Offer Letter concerning any incentive compensation,[5] Count I of the Complaint claims only a breach of the implied covenant of good faith and fair dealing attendant to that agreement.[6]

---

[5]      Plaintiff's attempt to obtain the incentive shares or some amount of commissions under a contract theory is dead on arrival, as the allegations of the Complaint, together with the plain text of the 2010 Offer Letter, confirm that Plaintiff had no present right to either.  First, the Complaint itself precludes any claim for breach of contract concerning the incentive shares.  As the Complaint reflects, the April 2010 Offer Letter made earning shares of Abiomed stock conditional on (1) achievement of each of three specific milestones, and (2) being employed by Abiomed on the date that each milestone was achieved.  Compl. ¶ 17 and Ex. A at p. 2. The Complaint alleges that Plaintiff was issued the shares related to meeting the first milestone (Compl. ¶ 39), and confirms that neither the second nor third milestone was met while he was still employed with Abiomed.  Compl. ¶¶ 64, 69, 70.  Accordingly, the Complaint establishes that there was no breach of the plain and unambiguous terms of the 2010 Offer Letter with respect to incentive pay.  (The claimed entitlement to the same as a result of a purported breach of the implied covenant of good faith and fair dealing is addressed below.)

Second, as to commissions, any right to the same could only arise from the 2010 Offer Letter, which, however,  plainly required Suzuki to be employed at the time of any Japan approval to even receive information about a commission structure (much less to be paid commissions):  "*Once approval is gained for Impella General Use in Japan and provided that you remain and are qualified to be employed in the Commercial leadership role, we will present to you a commission structure*.  While this structure is of course *subject to change*, *it is expected*

Under long-standing Massachusetts precedent, the implied covenant of good faith and fair dealing has very precise contours when applied in the employment context.  Specifically, the Fortune and Gram cases and their progeny stand for the proposition that because an at will employee[7] may be terminated without cause, such termination violates the implied covenant only if it is done (1) for the purpose of depriving the employee of benefits or compensation due or forthcoming at the time of discharge, and therefore in "bad faith" (Fortune v. Nat'l Cash Register Co., 373 Mass. 96, 104 (1977)) or (2) without "good cause" and thereby "deprives the employee of clearly identifiable future compensation reflective of the employee's past services" (Gram v.

---

that it _will_ provide a _plan_ that _will allow_ earnings of _up to a maximum_ of $1,000,000.00USD _over a two year period_."  Compl. Ex. A at p.1.  The Complaint itself repeatedly confirms this, even while it ultimately seeks payment of commissions.  See, inter alia, ¶ 14, 15, 16, 63; see, e.g., ¶ 14 (stating that the 2010 Offer Letter provided that he "would receive . . . _a commission opportunity_ . . . once the Impella devices became commercialized in Japan" though omitting the additional requirement of continued employment).  Nothing in the Complaint reflects that the parties had agreed to any specific amounts of commissions or the conditions under which they might have been earned, had any commission plan ever been put in place (which never occurred).  At most, the 2010 Offer Letter reflects that the parties agreed to review commission terms at a future date.  Given this, it is astounding that Plaintiff seeks to turn this conditional, forward-looking and non-specific language into an alleged present right to payment of commissions.  Lucey v. Hero Intl. Corp., 361 Mass. 569, 574-75 (1972) (holding that an agreement to enter into a contract that leaves the terms of the contract open for future negotiation is too indefinite to be enforced).  Further, in the absence of a valid contract with respect to commissions there can be no claim of breach of the implied covenant of good faith and fair dealing as to the same.  Moore v. Novastar Mortgage, Inc, No. 11-10468, 2011 WL 2899418 at *2 (D. Mass. Jul. 15, 2011).

Beyond the foregoing, Plaintiff also has not alleged (and could not allege) a breach of any claimed right to payment of commissions, because both the 2010 Offer Letter and the Complaint confirm that any commission payments would have been dependent on commercial sales, which admittedly never occurred during Suzuki's employment.  Compl. Ex. A ("Once approval is gained _and commercial sales have begun_, you will no longer be eligible for [an annual bonus]; but convert to the commission structure outlined in this paragraph.") (emphasis added); Compl. ¶ 16 (same).  Since Abiomed had not even gained regulatory approval by the time of Suzuki's separation, much less begun sales, no obligation to pay commissions ever arose, and thus no breach occurred.

[6] While the Complaint purports to assert a breach of contract claim as to the NCA for failure to provide 28 days' notice of his termination (Compl. ¶ 86; see Compl. Ex. B), the fact is that Abiomed has unconditionally paid Suzuki 28 days' wages.  Accordingly, and as Suzuki's counsel confirmed in correspondence to counsel for Abiomed dated November 1, 2016, the sole purpose of that claim at this point is as a subordinate allegation relating to the claim of breach of the implied covenant of good faith and fair dealing.

[7] The conclusory assertion in the Complaint that "Suzuki was not an at-will employee" is contradicted in the very same sentence by the recognition that he could be terminated without cause on 28 days' written notice (Compl. ¶ 77), as well as by the plain language of the 2010 Offer Letter discussed above, which the Complaint avers was not superseded.

Liberty Mut. Ins. Co., 391 Mass. 333, 335-36 (1984) (Gram II); see also Gram v. Liberty Mut. Ins. Co., 384 Mass. 659, 600 (1981) (Gram I) (concluding that the plaintiff was "entitled to recover identifiable, reasonably anticipated future compensation, based on his past services, that he lost because of his discharge without cause."). The fundamental premise of the doctrine is "to prevent an employer from being unjustly enriched by depriving the employee of money that he had fairly earned and legitimately expected." King v. Driscoll, 424 Mass. 1, 7 (1996) quoting Kravetz v. Merchants Distribs., Inc., 387 Mass. 457, 463 (1982).[8]

The Supreme Judicial Court has made clear that "[t]he Fortune doctrine does not protect interests contingent on an event that has not occurred." Harrison v. NetCentric Corp., 433 Mass. 465, 475 (2001) citing McCone v. New England Tel. & Tel. Co., 393 Mass. 231, 234–235 (1984); Gram II, 391 Mass. at 336. Specifically, Massachusetts state and federal courts have repeatedly found that the Fortune doctrine is inapplicable unless the Plaintiff has been deprived of compensation that was *already earned*. King v. Mannesmann Tally Corp., 847 F.2d 907, 908 (1st Cir. 1988) (finding that the Plaintiff "failed to show that the commissions were *earned,* even though not yet payable at the time of his termination.") (emphasis in original); McCone, 393 Mass. at 234-235 (explaining that "the Fortune doctrine requires that the plaintiff be deprived of [compensation] he already earned, even though it may not be due yet."). The parties' agreement controls whether and when the compensation is deemed earned. See, e.g., Harrison, 433 Mass. 473-74 (relying on the terms of the stock agreement to determine the conditions for when unvested shares were deemed earned); Micciche v. N.R.I. Data & Bus. Products, Inc., No. 09-11661, 2011 WL 4479849 (D. Mass. Sept. 27, 2011) (entering judgment against plaintiff where contingencies for payment of commissions set out in Compensation Plan were not met). It is

---

[8] Nothing in Plaintiff's Complaint implicates the "public policy" prong of the implied covenant.

well established that the covenant "may not be invoked to create rights and duties not otherwise provided for in the existing contractual relationship." Laudano v. 214 S. St. Corp., 608 F. Supp. 2d 185, 195 (D. Mass. 2009) quoting Liss v. Studeny, 450 Mass. 473, 477 (2008) (internal quotations omitted).

To survive a motion to dismiss this claim, Suzuki "must plead and show that 'the employer deprived the employee of money that [the employee] had *fairly earned* and *legitimately expected*.'" Wong v. Resolve Technology, No. 10–11642, 2011 WL 3157198 at *6 (D. Mass. Jul. 25, 2011) quoting Maddaloni v. Western Mass. Bus Lines, Inc., 386 Mass. 877, 884 (1982). The implied covenant is not breached where the compensation sought is not "reflective of past services." McCone, 393 Mass. at 235 (explaining that in the Gram line of cases, the Supreme Judicial Court had "held that, while the employee could recover renewal commissions on past sales because they constituted an identifiable, future benefit ... reflective of past services, he could not recover career credits because they constituted future compensation for future services.") (internal quotations omitted); Cort v. Bristol-Myers Co., 385 Mass. 300, 302 (1982) (finding no violation of the covenant of good faith and fair dealing where "[t]here was no evidence of any anticipated, measurable future compensation based on past services to which the plaintiff [was] entitled"). Work that merely sets the groundwork for the required conditions for payment being met in the future, particularly if that work is done by others after the employee's termination, does not support a claim for breach of the implied covenant. Mannesmann, 847 F.2d at 908 (finding no breach where Plaintiff merely played a "role in getting the appellee named as Digital's vendor," but the agreed conditions for receipt of commissions "did not occur until months after the appellant's discharge" and after negotiation by others); Gerald Rosen Co., Inc. v. Int'l Tel. & Tel. Co., 16 Mass. App. Ct. 929, 929 (1983) ("the fact that

[a sales representative's] efforts may have augmented the prospect for future orders does not bring its situation within the ambit of" either <u>Fortune</u> or <u>Gram</u>.).[9]

Here, the claim of breach of the implied covenant of good faith and fair dealing fails as a matter of law because the factual allegations of the Complaint demonstrate that by the time of his termination Suzuki had not gone beyond "laying the groundwork" for the achievement of approval in Japan or any eventual sales, and thus had not ***earned*** any incentive shares or commissions for his ***past*** services.  Beyond the fact that the Complaint states—as it must—that approval did not occur until over 15 months after Suzuki's termination, the Complaint specifically alleges that ***even if*** he had remained at Abiomed, approval still would not have occurred for another "***six to nine months***."  <u>Compl</u>. ¶ 68 (emphasis added).  The Complaint also alleges that Abiomed did not "devote sufficient resources" to obtaining approval.  <u>Id</u>.  The necessary and obvious inference from these allegations is that Suzuki himself would have had to perform additional work to obtain the desired approval.[10]  In other words, the Complaint states that Suzuki had not yet provided the services which, under different facts, might have entitled him to the amounts he now seeks.  As such, Suzuki's allegations reflect that he in fact had ***not*** "fairly ***earned***" these amounts, and that he could not have "***legitimately*** expected" their payment.  As a result, the claim for breach of the implied covenant must be dismissed.

---

[9] <u>See also</u> <u>Henderson v. L.G. Balfour Co.</u>, 852 F.2d 818, 823 (5th Cir. 1988) (citing <u>Gerald Rosen</u> and rejecting assertion that implied covenant was breached where employee "initiat[ed]" accounts that would "automatically lead to future income [for the employer] since little work would be needed to maintain the accounts").

[10] Understanding that Abiomed must accept the facts as pleaded, it is more than reasonably inferred that, where it admittedly took another 16 months after the May 2015 meeting to gain approval, there was much additional work to be done to gain the same.  Indeed, this is precisely what Plaintiff acknowledges by stating that he would have had to work for an additional six to nine months had he remained with Abiomed.  The conclusory assertions that are sprinkled throughout the Complaint, but are unsupported by any pleaded facts, to the effect that approval was "inevitable" by the time of Suzuki's departure (or was allegedly "regarded" by Abiomed as such) (<u>see, e.g.</u>, <u>Compl</u>. ¶¶ 54, 81), do not reflect facts (as opposed to conclusions) concerning the required element that Plaintiff have already earned the amount at issue, and thus need not be taken as true for purposes of this Motion.  Moreover, these conclusory statements are negated by Plaintiff's own later averments in Paragraph 68.

## II.     The Complaint Does Not Plead Facts Plausibly Reflecting Entitlement to Recovery under a Promissory Estoppel Theory.

In Count II of the Complaint, Plaintiff asserts entitlement to the compensation "he would have received if he had been allowed to continue through Japan's regulatory approval" on a theory of promissory estoppel.  Compl. ¶ 95.  In support of the claim, Plaintiff alleges that he was promised incentive compensation "based on the achievement of certain performance goals" and commissions "once the product was approved."  Compl. ¶ 90.  The Complaint also asserts that Abiomed "promised that it would devote sufficient resources to Suzuki reaching such goals and represented that the state of its testing was much more favorable than it actually was," that Suzuki relied on "such promises" by closing his business and accepting a lower salary, and that "[t]hrough his services" he "caused Abiomed to be in position where regulatory approval in Japan was inevitable and, relatively speaking imminent . . . ."  Compl. ¶¶ 91-94.

Plaintiff's averments reflect nothing more than a run-of-the-mill employment scenario – that he had an employment agreement whereby he was offered and accepted a position at an agreed-upon wage and with the potential to earn additional compensation if he produced certain agreed results and remained employed.  He acknowledges that he was paid his full salary, and received the first portion of the equity consistent with the parties' agreement.  The second and third milestones admittedly were not achieved during his employment, and indeed not for more than 15 months thereafter.  This simply is not the "stuff" of a promissory estoppel claim.

As an initial matter, the 2010 Offer Letter and the NCA preclude Plaintiff's claim as a matter of law because promissory estoppel is an alternative theory of recovery where a contract is defective for one reason or another—for example, lack of consideration.  See e.g., Loranger Const. Corp. v. E.F. Hauserman Co., 376 Mass. 757, 760-61 (1978) (legal effect of promissory estoppel is as a substitute for consideration); R.I. Hosp. Trust Nat'l Bank v. Varadian, 419 Mass.

841, 849–50 (1995) (same).  The theory has no application where a binding contract exists.  See,
e.g., Northrup v. Brigham, 63 Mass. App. Ct. 362, 369-70 (2005).  The Complaint confirms that
the alleged promises regarding incentive compensation and future commissions were
memorialized in the 2010 Offer Letter, and nowhere does the Complaint suggest that the same is
defective.[11]  Indeed, Plaintiff's first count seeks the same damages due to Abiomed's alleged
breach of the implied covenant of good faith and fair dealing associated with the 2010 Offer
Letter, a claim that depends on the existence of a valid contract.  Accordingly, Count II of the
Complaint is deficient as a matter of law and must be dismissed on that basis.

Even apart from this independently sufficient basis for dismissal, the claim fails because,
as a matter of law, Plaintiff could not reasonably rely on prior oral promises regarding his terms
of employment in light of the plain terms of the 2010 Offer Letter.  A prerequisite for a
promissory estoppel claim is that "the party invoking it must have *reasonably* relied on the
alleged promise to his detriment."  Coll v. PB Diagnostic Sys., Inc., 50 F.3d 1115, 1124 (1st Cir.
1995), quoting Hall v. Horizon House Microwave, 24 Mass. App. Ct. 84 (1987) (emphasis in
Coll).  In general, reliance on a prior oral representation in the presence of a conflicting written
statement is unreasonable as a matter of law.  Id. at 1124-25 (upholding summary judgment
against the employee on his promissory estoppel claim founded on an alleged oral promise by
the employer to create an incentive plan that could pay the employee up to $1,000,000, where a
subsequent offer letter failed to memorialize any obligation by the employer to do so, and
refusing to allow the employee to "claim the benefit of a bargain he did not negotiate").

---

[11] To the contrary, the Complaint explicitly asserts that although the NCA was signed later and contains an
integration clause, it "complemented, and did not supersede, the terms of the" 2010 Offer Letter, Compl. ¶ 25, and
Abiomed does not contend that either the 2010 Offer Letter or the NCA is defective or unenforceable.  Thus, unlike
in some cases where the promissory estoppel claim might be viewed as having been pled in the alternative because
there is a possible set of facts that would reflect that the contract was invalid, there is no sense in which this claim is
pled here "in the alternative."

Here, the 2010 Offer Letter imposed explicit conditions on the receipt of incentive shares (achievement of three specific goals coupled with continued employment), while as to commissions, it merely stated that a plan would be provided later, conditional on regulatory approval, sales occurring, and Suzuki's continued employment.[12] Ex. A.  Further, the 2010 Offer Letter expressly stated that it "constitutes our entire offer regarding the terms and conditions of your employment by ABIOMED and it supersedes any prior agreements, or other promises or statements (whether oral or written) regarding the offered terms of employment."[13] Id. at p. 3.  As a result, to the extent that Plaintiff asserts that Abiomed made any prior promise *different* from what is stated in the 2010 Offer Letter, reliance on such a promise was unreasonable as a matter of law.  Moreover, to the extent the Complaint reflects that the promises were *the same* as stated in the 2010 Offer Letter, it fails for the same reasons as discussed above, specifically that the Complaint shows that Plaintiff did not meet the conditions precedent for receiving the incentive shares and commissions.

## III.   Plaintiff Has Not Asserted a Valid Quantum Meruit Claim as a Matter of Law.

Count III of the Complaint purports to state a claim against Abiomed for quantum meruit predicated on the same facts as Plaintiff's Breach of Contract/Breach of Implied Covenant of Good Faith and Fair Dealing and Promissory Estoppel claims.  Compl, ¶¶ 96-98.  While the

---

[12] As has already been addressed in detail above, the 2010 Offer Letter cannot conceivably be construed as creating an enforceable promise to pay any amount of commissions whatsoever.  The plain text reflects that, at most, the Company undertook to *create* a *commission plan* at some point in the future, assuming Suzuki had achieved the specified goal of obtaining approval in Japan.  Yet even if that had ever been triggered, it is self-evident that such a plan would have specified new conditions for earning commission payments, for example the achievement of sales or other metrics, none of which has been (or could be) alleged in the Complaint.

[13] The Complaint contains two additional assertions that purport to relate to the promissory estoppel claim.  First, Suzuki asserts that Abiomed "promised that it would devote sufficient resources to Suzuki reaching such goals" Compl. ¶ 91.  This conclusory statement is entirely devoid of any *factual* predicate in the Complaint identifying the actual substance of the claimed promise.  Second, the Complaint asserts that Abiomed "represented that the state of its testing was much more favorable than it actually was."  Id.  Beyond the fact that this, too, is a conclusion and not a fact, the allegation does not reflect any promise whatsoever.  As such, neither assertion leads to an entitlement that is enforceable under a promissory estoppel theory.

allegations in this count are sparse, Suzuki appears to be claiming that he conferred the benefit of attaining Japanese regulatory approval, and that Abiomed was therefore enriched by not providing the equity that had been conditioned on the regulatory approval occurring.  Id.

As an initial matter, under Massachusetts law, similar to promissory estoppel, a claim for quantum meruit (also called unjust enrichment) cannot be sustained where there is an agreement covering the same subject.  Boswell v. Zephyr Lines, Inc., 414 Mass. 241, 250 (1993) ("[r]ecovery in quantum meruit presupposes that no valid contract covers the subject matter of a dispute.  Where such a contract exists, the law need not create a quantum meruit right to receive compensation for services rendered.").  Courts regularly dismiss such claims on motion under Rule 12(b)(6).  See, e.g., Ruiz v. Bally Total Fitness Holding Corp., 447 F. Supp. 2d 23, 29 (D. Mass. 2006) (dismissing unjust enrichment claim where a valid, express contract governed the parties' relationship); Boston Med. Ctr. v. Sec'y of Exec. Office of Health and Human Servs., 463 Mass. 447, 467 (2012) (motion to dismiss quantum meruit claim upheld on the grounds that "[a] plaintiff is not entitled to recovery on a theory of quantum meruit where there is a valid contract that defines the obligations of the parties.").  This may occur regardless of whether the contract claim ultimately may be dismissed.  Spears v. Miller, 2006 Mass. App. Div. 151 at *3 (Mass. App. Div. Sept. 26, 2006) (affirming Rule 12(b)(6) dismissal of unjust enrichment claims where plaintiff alleged existence of an enforceable employment contract, regardless of whether the contract claim might ultimately be subject to dismissal).  Since Count III is predicated precisely on the subject matter covered by the 2010 Offer Letter, it is barred as a matter of law.

Plaintiff's purported claim is also deficient because he has failed to allege facts that plausibly suggest entitlement to relief.  Specifically, the pleaded facts do not reflect that Plaintiff actually conferred the claimed benefit of obtaining regulatory approval in Japan.

Unjust enrichment requires three elements: "(1) a benefit conferred upon the defendant by the plaintiff; (2) an appreciation or knowledge by the defendant of the benefit; and (3) acceptance or retention by the defendant of the benefit under the circumstances would be inequitable without payment for its value."  Mass. Eye & Ear Infirmary v. QLT Phototherapeutics, Inc., 552 F.3d 47, 57 (1st Cir. 2009) (citing Samuel Williston & Richard A. Lord, A Treatise on the Law of Contracts, § 68:5 (4th ed. 2003)).  As pleaded in the Complaint, Plaintiff's claim relies entirely on the conclusory assertion that by the time of his termination, "it had become apparent that regulatory approval was going to happen" though approval was not yet "formally and technically met."  Compl. ¶ 98.  This conclusion is directly contradicted by the allegations of Paragraph 68, that "Abiomed failed to devote sufficient resources" to obtaining approval and that "[i]f Suzuki had continued working" approval would "likely have occurred within six to nine months."  The inescapable inference arising from these allegations is that Suzuki would have been doing additional, necessary work for a further six to nine months to secure approval.  Moreover, the Complaint confirms that, in fact, approval was not achieved for over 15 months after his departure.  The factual allegations of the Complaint thus do not merely fail to reflect, but affirmatively preclude, the claim that by the time of his termination Suzuki had "conferred the benefit" of attaining regulatory approval for which he is entitled to compensation beyond what he previously received.  As such, Count III must be dismissed with prejudice.

## IV.   The Wage Act Retaliation Claim Must Be Dismissed Because Plaintiff Has Not Pled Facts Reflecting that His Alleged Protected Conduct Concerned Wages Within the Meaning of the Act.

The factual and legal basis for Plaintiff's purported claim for retaliation under the Wage Act is difficult to discern.  However, as best as Abiomed can determine, the claim is premised on the contention that by objecting to Abiomed's plan to change his incentive shares and eliminate commissions as an aspect of his future compensation, all on a prospective basis, and all before

regulatory approval in Japan had been granted, Suzuki was complaining about "wages" subject

to the Wage Act, and so was engaged in protected conduct, making his subsequent termination

due to his refusal to accept these changes "retaliation" under Section 148A.

As a threshold matter, since Suzuki was an employee at will (see footnote 7 above),

Abiomed obviously could modify the terms of his employment on a go-forward basis, including

his compensation structure, to the extent not yet earned, and indeed expressly provided as much

in the 2010 Offer Letter.  Ex. A at 2 ("ABIOMED, of course, *reserves the right on a prospective*

*basis to modify, change or eliminate* its Compensation, Bonus or Benefit programs, at the

Company's sole discretion").  It is abecedarian that if an employer can change an at-will

employee's compensation, it also cannot incur liability under the Wage Act for such changes as

to wages not yet earned, because the Wage Act only imposes obligations on payment once wages

are earned.  See, e.g., Weems v. Citigroup Inc., 453 Mass. 147, 150 (2009). As such, since

Abiomed had the absolute right to change Suzuki's compensation structure prospectively, such a

change could not be the basis for a retaliation claim under the Wage Act.

As to the anti-retaliation provision of the Wage Act, Section 148A states, in relevant part:

"No employee shall be penalized by an employer in any way as a result of any action on the part

of an employee to seek his or her rights under the wages and hours provisions of this chapter."

To be considered protected activity under the Wage Act, the complaint must be made by "an

employee who reasonably believes that the wages he or she has been paid violate" the wage-hour

laws.  Smith v. Winter Place LLC, 447 Mass. 363, 367 (2006).  However, the claim will fail if,

as here, the subject of the alleged complaint does not fall within the scope of the law.  Comley v.

Media Planning Grp., 108 F. Supp. 3d 6, 12 (D. Mass. 2015) ("As Comley had no right to

payment [of a discretionary bonus] under the Wage Act, she has no right to a retaliatory remedy

based on the statute in the absence of any evidence that her employers at the very least perceived her to be attempting to invoke her (non-existent) rights under the Act.").

An agreement to pay an employee equity falls outside the definition of "wages" for purposes of the Wage Act.  See Sterling Research, Inc. v. Pietrobono, No. 02-40150, 2005 WL 3116758, at *14 (D. Mass. Nov. 21, 2005) (holding that compensation in the form of stock was not covered by the Wage Act, despite employee's argument that the stock was intended as a "salary substitute" that was "earned over time," and noting that "not all items that are earned are 'wages' for purposes of the statute").  Moreover, it is well established that the Wage Act does not encompass compensation that is contingent on some unfulfilled occurrence.  In determining what constitutes a "wage" under the Wage Act, courts look to the law's "basic purpose," which is "to prevent the unreasonable detention of wages."  Weems, 453 Mass. at 150.  The law requires employers to pay the "wages earned" by employees at specified times, Mass. Gen. Laws ch. 149, § 148, but "distinguishes between assured compensation and contingent compensation." Roche v. Morgan Collection, Inc., 882 F. Supp. 2d 247, 255 (D. Mass. 2012).  Only the former is within the purview of the Act.

Applying this premise, the Massachusetts Supreme Judicial Court and federal courts have repeatedly held that contingent stocks and other incentive pay are excluded from the concept of a "wage" subject to the Wage Act.  See, e.g., Weems, 453 Mass. at 154 (finding that stocks whose vesting was contingent on continued employment were outside the Wage Act); Harrison, 433 Mass. at 466, 473 (finding no Wage Act violation as to unvested shares that would vest if employment continued, which were "not earned compensation for past services, but compensation contingent on continued employment"); Sheedy v. Lehman Bros. Holdings Inc., No. 11-11456, 2011 WL 5519909, at *4 (D. Mass. Nov. 14, 2011) ("The law is clear that

incentive or other bonus compensation is outside the scope of the Wage Act unless it qualifies as 'commissions' that are ascertained and due"; finding that incentive signing bonus was not within the Wage Act).[14]

Commissions fall within the definition of "wages" under the Wage Act only when the amount "has been definitely determined and has become due and payable" to the employee (Mass. Gen. Laws ch. 149 § 148), which in turn means that the commissions have become "arithmetically determinable." Weems, 453 Mass. at 151. If a commission is dependent on the occurrence of a contingency, the contingency must already have occurred for the commission to be considered "definitely determined." Scalli v. Citizens Financial Group, Inc., No. 03-12413, 2006 WL 1581625 at *14 (D. Mass. Feb. 28, 2006) (finding no Wage Act violation where commissions on sales in employee's pipeline at the time of her termination were merely "potential commissions," which "cannot be considered 'definitely determined' and 'due and payable.'"); Cumpata v. Blue Cross Blue Shield of Mass., Inc., 113 F. Supp. 2d 164, 168 (D. Mass. 2000) (finding that a claim for incentive commission contingent on exceeding a sales quota and calculated on a quarterly basis was not cognizable under Section 148 where those contingencies had not been met).

Here, as discussed in detail above, the remaining stock options identified in the 2010 Offer Letter were wholly contingent on Plaintiff achieving the second and third milestones, which the Complaint confirms did not occur. By the same token, Plaintiff had not earned a commission that was definitely determined and due and payable by the time of his separation: apart from everything else, a commission on a sale that has not yet occurred is, under any

---

[14] See also Baptista v. Abbey Healthcare Group, Inc., No. 95-10125, 1996 WL 33340740, at *4 (D. Mass. Apr. 10, 1996) (finding that contingent stock options are not subject to the Wage Act). While the interpretation reflected in Baptista that the Wage Act does not apply to highly compensated employees is no longer followed, the view that contingent compensation, such as incentive stock options, falls outside the scope of the Act remains good law.

definition, not "arithmetically determinable," and the Complaint confirms that there was not even approval for commercial activity in Japan prior to Suzuki's separation, let alone any sales. Indeed, the Complaint makes clear that neither the incentive shares nor any commission even came close to being wages that were then due and owing to Plaintiff.  In light of this, and considering the clear and consistent treatment of the subject under Massachusetts law, not only were the incentive shares and commissions not within the scope of the Wage Act, but Plaintiff could not reasonably have believed them to be such.  Accordingly, Plaintiff's alleged refusal to accept new terms that would have changed those aspects of his compensation did not, as a matter of law, constitute protected activity subject to the Act.

The present case is similar to the recent case of Costello v. Whole Foods Market Group, Inc., No. 16-10673, 2016 WL 4186927 (D. Mass. Aug. 8, 2016).  There, the Plaintiff, who was at all times paid above the minimum wage, claimed that he was terminated in retaliation for seeking a raise after being given added responsibilities, which he alleged constituted a complaint about rights protected by the Minimum Fair Wage Law and the Wage Act.  Id. at * 1-2.  The Court dismissed both claims on a Rule 12(b)(6) motion.  As to the Minimum Wage retaliation claim, the Court found that the Plaintiff could not have had the required *reasonable* belief that his alleged complaints were within the scope of the law:  "Given the way the law has been administered, it would not have been *reasonable* for [Plaintiff] to believe that his employer violated the minimum wage law by not giving him a raise from an already above-minimum wage to an even higher wage.  The MFWL has never been interpreted to do that."  Id. at *3 (emphasis in original).  Similarly, the Court found that Plaintiff could not have held a reasonable belief that the denial of the raise violated the Wage Act, "because the Wage Act in no way touches upon the plaintiff's desired goal (to receive a raise) . . . ."  Id. at *4.  As the Court explained:

"The basic purpose of the Wage Act is to prevent the unreasonable detention of wages." [quoting <u>Weems</u>].  Like the [Minimum Wage Law], the Wage Act's command is simple and straightforward.  When an employee has done the work and earned his wages, the employer is required to promptly pay him.  The Wage Act does not give employees a right to demand payment for what they believe they should be paid.  For example, for the payment of commissions, the Wage Act only applies when commissions are "arithmetically determinable".  . . .  Similarly, discretionary bonuses do not fall under the Act, because "employers are . . . under no obligation to award them."  <u>Id.</u> at *3.

The Court's discussion of the purposes and scope of the Wage Act confirms that Suzuki, too, has failed to allege a plausible Wage Act retaliation claim.  Suzuki does not (and could not) allege that Abiomed withheld any wages (or indeed any other amounts, whether or not deemed "wages" within the meaning of the Wage Act) as to which he was already entitled to payment.  Suzuki's sole objection was to ***prospective*** changes to his ability to earn incentive shares and as-yet theoretical commissions.  <u>Compl.</u> ¶ 62 (". . . Suzuki specifically pointed out that cancelling his ***potential*** commission would not be fair . . .") (emphasis added); <u>id.</u> at ¶¶ 60, 62 (noting that the proposed amendments would have cancelled the Performance Share awards that had been granted but never issued or vested, and replaced them with grants of Restricted Stock Units, which also would be conditional on the achievement of certain milestones).  In the parlance of <u>Costello</u>, because the Wage Act in no way touches upon Plaintiff's desired goal (to retain the ability to potentially earn certain types of incentive shares and commissions in the future), he cannot be said to have ***reasonably*** believed denying him the same violated the Wage Act.

Plaintiff may cite to the Massachusetts Appeals Court decision in <u>Fraelick v. Perkettpr, Inc.</u>, 83 Mass. App. Ct. 698 (2013), a case that is readily distinguishable from the instant matter.  In <u>Fraelick</u>, the Plaintiff asserted a Wage Act retaliation claim based on the employee having been terminated shortly after raising concerns about the employer's failure to reimburse business expenses that were promised by the employer pursuant to its paid expenses program and admitted to be due.  <u>Id.</u> at 701-2.  While the Court noted that business expenses may not

constitute "wages,"[15] it reasoned that the employee's concerns about the failure to pay these amounts implicated the anti-retaliation provisions because by failing to pay the expenses the employer effectively took improper deductions from clearly earned wages and failed to pay wages timely.  The Appeals Court found sufficient that Fraelick had alleged that her employer "engaged in a pattern of nonpayment, coupled with continued demands that the employee advance expense monies in ever-increasing amounts, and fired her when she refused to advance any more money for the employer's benefit."  Id. at 707.  The Court noted that an "employer may not reduce wages by, or condition the full and timely payment of wages on, payments by an employee to or on behalf of the employer," and that "wages must be paid both in a timely manner and in full," and concluded that the pleaded facts reflected that the arrangement "falls short on both fronts."  Id. at 708.

This contrasts sharply with Suzuki's allegations, which reflect only that he objected to a change in future incentives and commissions at a time when the conditions for their receipt had not yet occurred, and by his own account would not have even begun to be met for many months.  This does not amount to a claim that Abiomed improperly withheld or deducted wages already earned, and thus Plaintiff has failed to state a claim plausibly suggesting entitlement to relief under the Wage Act.

## CONCLUSION

For all the reasons stated above, Abiomed respectfully requests that all Counts of the Complaint be dismissed, with prejudice.

---

[15] In fact, there appears to be disagreement as to whether business expenses are actually outside the scope of the Wage Act.  For example, in 2014 Judge Stearns certified a question relating to deductions to the SJC, and pointed out a possible tension between Fraelick and Awuah v. Coverall N. Am. Inc., 460 Mass. 484 (2011), which he viewed as holding that "an employer cannot effectively reduce an employee's wages by shifting business costs to the employee."  Schwann v. FedEx Ground Package Sys., Inc., No. 11–11094, 2014 WL 496882, at *2-3 (D. Mass. Feb. 7, 2014).  However, the question was withdrawn for procedural reasons before the SJC issued a determination.

Respectfully submitted,

ABIOMED, INC.

By its attorneys,

/s/ Alexandra D. Thaler
Kenneth M. Bello, BBO #036630
Alexandra D. Thaler, BBO #677785
Bello Welsh LLP
125 Summer Street, Suite 1200
Boston, Massachusetts 02110
tel: (617) 247-4100
fax: (617) 247-4125
kbello@bellowelsh.com
adthaler@bellowelsh.com

Dated: December 14, 2016

## CERTIFICATE OF SERVICE

I, Alexandra D. Thaler, hereby certify that on December 14, 2016, I electronically filed the foregoing *Memorandum in Support of Defendant's Motion to Dismiss* using the CM/ECF system, which will send notification of such filing to all registered participants.

/s/ Alexandra D. Thaler