# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **KEISUKE SUZUKI,** | |
| Plaintiff, | |
| v. | Civil Action No. 16-12214 |
| **ABIOMED, INC.,** | |
| Defendant. | |

## MEMORANDUM AND ORDER

**CASPER, J.**                                                                                                                                           May 19, 2017

## I. Introduction

Plaintiff Keisuke Suzuki ("Suzuki") has filed this lawsuit against Defendant Abiomed, Inc. ("Abiomed") alleging a breach of the implied covenant of good faith and fair dealing and claims for promissory estoppel or quantum meruit. D. 1. Defendant has moved to dismiss. D. 10. For the reasons stated below, the Court DENIES the motion.

## II. Standard of Review

To survive a Rule 12(b)(6) motion to dismiss, the factual allegations in a complaint must "possess enough heft" to state a claim to relief that is plausible on its face. <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 557 (2007). "A claim has 'facial plausibility' when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678 (2009) (citing <u>Twombly</u>, 550 U.S. at 556). The court must "isolate and ignore statements in the complaint that simply offer

1

legal labels and conclusions or merely rehash cause-of-action elements." Schatz v. Republican State Leadership Comm., 669 F.3d 50, 55 (1st Cir. 2012). A complaint does not need detailed factual allegations, but "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Iqbal, 556 U.S. at 678. The court must then "take the complaint's well-[pleaded] (*i.e.*, non-conclusory, non-speculative) facts as true, drawing all reasonable inferences in the pleader's favor, and see if they plausibly narrate a claim for relief." Schatz, 669 F.3d at 55. "Plausible, of course, means something more than merely possible, and gauging a pleaded situation's plausibility is a 'context-specific' job that compels [the Court] to draw on' [its] 'judicial experience and common sense." Id. (internal citations omitted).

### III. Factual Background

Taking all factual allegations in the complaint as true, as required at this stage, the Court considers the following facts. Abiomed is a publicly traded company that is a leading provider of temporary mechanical circulatory support devices—also known as "heart pumps." D. 1 ¶ 7. The specific line of heart pumps that Abiomed develops, manufactures and markets is called "Impella." Id. In the years relevant to this complaint, Abiomed sought to expand the use of, and gain regulatory approval for, its Impella line of products and was particularly interested in obtaining regulatory approval for Impella's sale in Japan. Id. ¶ 8.

Suzuki has worked as a manager or director in the medical device field since 1998. Id. ¶ 6. From 1998 until 2006, he worked in Japan at Guidant Japan, K.K. ("Guidant"), a Japanese subsidiary of a large medical device company. Id. In or about January 2007, Suzuki left Guidant and established Kaye Suzuki Device Consulting, LLC ("Suzuki Consulting"), which provided consulting services to companies seeking to introduce medical devices into the Japanese market. Id. ¶ 9. One of Suzuki Consulting's clients was Abiomed and Suzuki provided consultation

services relating to its seeking approval in Japan of its Impella line of heart pumps. Id. ¶ 10. As the principal of Suzuki Consulting, Suzuki alleges that he earned approximately $500,000 per year. Id. ¶ 12.

In 2009, Suzuki and Abiomed's CEO Michael Minogue ("Minogue") and its Vice President of Healthcare Solutions Andrew Greenfield ("Greenfield") began discussing the possibility of Suzuki shutting down his consulting business and becoming a full-time employee at Abiomed. Id. ¶ 13. At the time, Abiomed was not particularly profitable and both Minogue and Greenfield had made clear that they wanted to minimize Abiomed's expenses. Id. Although Suzuki informed Minogue and Greenfield that he made $500,000 per year at his consulting company, he indicated that he would be willing to sacrifice his short-term base salary for long-term incentive compensation. Id.

On April 1, 2010, Abiomed made a written offer of employment ("Offer Letter") to Suzuki for the position of Vice President of Asia with an annual salary of $250,000, an annual bonus of up to $100,000 and a commission opportunity of up to $1 million. Id. ¶ 14. Additionally, the Offer Letter reflected that Suzuki would be awarded up to 45,000 shares of Abiomed common stock which would be contingent on meeting three benchmarks. Id. ¶¶ 14, 17. Specifically, (1) a performance share of 10,000 shares of Abiomed's stock would issue upon the successful submission of an application to Japan's Pharmaceutical and Medical Device Agency ("PMDA") for Impella use in Japan; (2) a performance share of 20,000 shares of Abiomed's stock would issue when Japan's Ministry of Health, Labor, and Welfare approved Impella for general use; and (3) a performance share of 15,000 shares of Abiomed's stock would issue "when Approval for targeted reimbursement level of Impella is gained." Id. ¶ 17. The Offer Letter further stated that the performance share awards "require that you continue to be employed by the Company on the date

3

that any of these milestones are achieved . . . " and that "[o]nce approval is gained for Impella General Use in Japan and provided that you remain and are qualified to be employed in the Commercial leadership role, we will present to you a commission structure." Id. ¶ 16. On or about April 9, 2010, Suzuki terminated his consulting business and moved from Japan to Massachusetts to begin working as Vice President at Abiomed. Id. ¶¶ 18-22. On April 10, 2010, Suzuki signed an Employment, Nondisclosure, and Non-Competition Agreement (the "Nondisclosure Agreement"). Id. ¶ 23. The Nondisclosure Agreement stipulated that after six months of employment, Abiomed could terminate Suzuki without cause upon 28 days' written notice or with cause at any time. D. 1-4 at 1.

On April 29, 2010, in accordance with the Offer Letter, Abiomed granted Suzuki three awards of performance shares, none of which would vest or issue until the achievement of the specific goals outlined in the letter. D. 1 ¶ 27. By March 31, 2011, Suzuki had met the first milestone under the Offer Letter and Abiomed issued him 10,000 shares of common stock. Id. ¶ 39. At the time, the stock was trading at $14.53 per share and the total value to Suzuki was $145,300. Id.

Suzuki alleges that while he continued working on getting the Impella line of devices approved for general use in Japan, Abiomed refused to devote the resources necessary to achieve such a result. Id. ¶¶ 40-43. For example, PMDA invited Abiomed to a "kick-off" meeting in June 2011 where it presented Abiomed with hundreds of questions that it wanted answered by September 2011. Id. ¶ 40. Despite this deadline, Abiomed failed to answer the questions until a year later. Id. ¶ 41. Moreover, Abiomed continued to be consumed by fixing various problems identified in the Impella device. Id. ¶ 42. Because no other Abiomed employees, with the exception of Minogue, had compensation incentives tied to gaining approval in Japan, expansion

4

to the Japanese market was not a priority. Id. Nonetheless, Suzuki continued working on obtaining regulatory approval and also worked on preparing the Japanese market for entry of the Impella line. Id. ¶ 44. By March or April 2015, Suzuki's continued work in Japan paid off and he was able to secure a meeting between Abiomed's representatives and officials at the PMDA. Id. ¶ 46. While Abiomed originally had concerns that Impella would not be approved without being required to first conduct a costly and time-consuming human study in Japan, PMDA made clear that no such study would be mandated. Id. ¶ 47. Furthermore, PMDA informed Abiomed that it was inclined to approve the Impella line for general use once it received updated reports addressing four modifications that the company had made to the device since it had submitted the original application. Id.

At this point, Suzuki alleges that his value to Abiomed decreased precipitously. Id. ¶ 49. Indeed, following the meeting with PMDA, Abiomed regarded it as a near certainty that Japan would approve Impella for general use. Id. ¶ 48. Suzuki's work had largely paved the path toward regulatory approval—especially his shepherding of the application through Japanese regulatory authorities—and he had also established Abiomed's new Japanese subsidiary and staffed its office in Japan. Id. ¶ 50. Abiomed realized that Suzuki's continued employment through the time of Japan's eventual approval of Impella's general use would thereby require it to issue Suzuki the 20,000 shares called for in the Offer Letter. Id. ¶ 51. Because Abiomed's stock value had significantly increased since the time of the original offer, the 20,000 shares would be equivalent to a $1.3 million value, a value that Suzuki alleges was much greater than Abiomed had planned on paying Suzuki. Id. Suzuki further contends that, once approval and reimbursement issued, Abiomed realized he would be entitled to an additional 15,000 shares of common stock and eligible for future commission rights as outlined in the Offer Letter. Id. ¶ 52. Rather than follow through

5

with the terms outlined in the Offer Letter, Suzuki alleges that Abiomed decided to give him a falsely negative job performance review to lay the groundwork necessary to avoid the mandatory contractual terms outlined in the letter. Id. ¶ 55. Furthermore, Abiomed decided to deny Suzuki his annual bonus and diminish his role in the company. Id. Prior to this point, Suzuki had never had a negative job performance review and he always received annual bonuses of between $80,000 and $90,000 per year. Id. ¶ 56. He had also consistently been given salary raises each year. Id.

On May 14, 2015, Greenfield met with Suzuki and discussed changing his duties and compensation structure. Id. ¶ 57. Several days later, Greenfield provided Suzuki a proposed amendment to the Offer Letter in the form of a letter entitled "Amendment to Offer Letter Dated April 1, 2010" (the "Proposed Amendment"). Id. ¶ 58. The Proposed Amendment would have limited Suzuki's duties to Japan, rather than all of Asia, and would have cancelled the remaining 35,000 performance shares that would be owed to him under the terms of the original Offer Letter. Id. ¶ 60. Instead, Suzuki would receive Restricted Stock Units ("RSUs") in lower amounts and at significantly less value than the performance shares originally promised in the Offer Letter. Id. Moreover, under the Proposed Amendment, the change to RSUs would be coupled with a stipulation stating that Suzuki would not be granted the shares, but instead would simply have the right to purchase them in an amount later determined by Abiomed's Compensation Committee. Id. Lastly, the Proposed Amendment provided that Suzuki's entitlement to future commissions following Japan's approval of Impella would be cancelled. Id. Suzuki rejected the Proposed Amendment. Id. ¶ 61.

On May 22, 2015, Abiomed presented Suzuki with another proposal (the "Revised Proposed Amendment"). Id. ¶ 62. The Revised Proposed Amendment was allegedly even more unfavorable to Suzuki as it kept the majority of the terms of the Proposed Amendment, but lowered

6

the potential award of RSUs.  Id.  On May 26, 2015, Suzuki submitted a written statement to Abiomed rejecting the proposed changes.  Id. ¶ 63.  He noted that the "whole purpose is not about needing to change after 5 years, but more about not wanting to keep the original deal between [him] and [Abiomed], as the value of the equity have risen far beyond what the company foreseen (sic) at that time."  Id.  Moreover, he expressed that Abiomed's reasoning for altering the terms of the Offer Letter was obvious "as the company does not want to change [his] salary but only the equity and commission portion only."  Id.

Suzuki was terminated from his position on June 18, 2015, without cause.  Id. ¶ 64.  At the time of Suzuki's termination the price of Abiomed's common stock was $67.16 per share.  Id. ¶ 67.  Suzuki alleges that following his termination, Abiomed did not devote the necessary resources to promptly obtaining regulatory authority in Japan.  Id. ¶ 68.  Had he continued working there, approval would likely have been granted within six to nine months.  Id.  Instead, approval occurred on September 27, 2016, fifteen months after Suzuki was terminated.  Id. ¶ 69.

## IV. Procedural History

Suzuki instituted this action on November 1, 2016.  D. 1.  Abiomed has now moved to dismiss.  D. 10.  In the time since Abiomed filed its motion to dismiss, Suzuki has voluntarily dismissed his breach of contract claim based on Abiomed's alleged breaching of the express terms of the NCA by failing to provide him 28-days' written notice before terminating him, as well as a retaliation claim under the Massachusetts Wage Act, G. L. c. 149, §148A.  D. 18.  The Court heard the parties on the pending motion as to the remaining claims and took the matter under advisement.  D. 23.

## V. Discussion

### A. Suzuki Has Adequately Pled a Breach of the Implied Covenant of Good Faith and Fair Dealing Claim (Count I)

Suzuki brings a claim against Abiomed for breach of the implied covenant of good faith and fair dealing. D. 1 at ¶¶ 72-88. "Under Massachusetts law, "[e]very contract implies good faith and fair dealing between the parties to it."" Young v. Wells Fargo Bank, N.A., 717 F.3d 224, 237 (1st Cir. 2013) (quoting T.W. Nickerson, Inc. v. Fleet Nat. Bank, 456 Mass. 562, 569 (2010)). The implied covenant provides "that neither party shall do anything that will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." Anthony's Pier Four, Inc. v. HBC Assocs., 411 Mass. 451, 471 (1991). This "guarantee[s] that the parties remain faithful to the intended and agreed expectations of the parties in their performance." Uno Rests., Inc. v. Bos. Kenmore Realty Corp., 441 Mass. 376, 385 (2004).

Traditionally, an at-will employment contract is one that, by its express terms, may be terminated by either party without reason. Fortune v. Nat'l Cash Register Co., 373 Mass. 96, 100 (1977). Nevertheless, an employer may be liable for a breach of the implied covenant of good faith and fair dealing when it terminates an at-will employee in certain circumstances. See id. at 104. Where termination occurs for the purpose of depriving the employee of benefits or compensation due or forthcoming at the time of discharge, the termination is considered to have been rendered in "bad faith" and the covenant is, therefore, considered to have been breached. Id. (the "Fortune doctrine"). Additionally, a breach of the covenant may occur where an employer terminates an employee without "good cause" thus "depriv[ing] the employee of clearly identifiable future compensation reflective of the employee's past services." Gram v. Liberty Mut. Ins. Co., 391 Mass. 333, 335-36 (1984) (the "Gram doctrine"). Fundamentally, in an employment contract terminable at-will, the purpose of the implied covenant is to "to prevent an employer from

8

being unjustly enriched by depriving the employee of money that he had fairly earned and legitimately expected." Kravetz v. Merchs. Distribs., Inc., 387 Mass. 457, 463 (1982). Thus, a motion to dismiss can be defeated where a plaintiff has plausibly alleged the "unfair leveraging of the contract terms to secure undue economic advantage." Robert Reiser & Co. v. Scriven, 130 F. Supp. 3d 488, 496 (D. Mass. 2015).

Here, Suzuki alleges that during his employment with Abiomed, his primary role consisted of getting the Impella line of heart pumps approved for general use in Japan and preparing for Japanese market entry. D. 1 ¶¶ 43-44. Through his efforts over a course of years—including lobbying Japanese officials, arranging meetings with important Japanese authorities, requesting product testing and organizing presentations for Japanese cardiologists—Suzuki, as he alleges, was able to secure a promise from Japanese regulators that they were prepared to approve the Impella for general use once Abiomed submitted updated reports addressing a few modifications to the device which had occurred since the initial application. Id. ¶¶ 46-47. According to Suzuki, Abiomed recognized that under the employment contract, approval by Japanese regulators for Impella's general use would necessarily trigger the issuance of 20,000 shares of common stock to Suzuki. Id. ¶¶ 17, 51. Rather than follow through with the agreement outlined in the Offer Letter, Abiomed attempted to change the terms of Suzuki's compensation so as to take away his stock rights and future commission rights and, when Suzuki rejected those changes, Abiomed terminated his employment and Impella's approval for general use was later secured. Id. ¶¶ 53, 63-64, 70.

Abiomed argues that Suzuki's claim must be dismissed because at the time of his termination, Suzuki had done nothing more than "lay[] the groundwork" for eventual approval by Japanese authorities authorizing Impella's general use. D. 11 at 11. Relying upon the premise that "[t]he Fortune doctrine does not protect interests contingent on an event that has not occurred,"

9

Harrison v. NetCentric Corp., 433 Mass. 465, 475 (2001), Abiomed maintains that Suzuki cannot plausibly allege his claim where Japanese approval did not occur for another fifteen months after he was let go. D. 11 at 11. Moreover, the implied covenant of good faith and fair dealing cannot be breached where the compensation sought is not "reflective of past services." McCone v. New England Tel. & Tel. Co., 393 Mass. 231, 234-35 (noting that in Gram, the Supreme Judicial Court had "held that, while the employee could recover renewal commissions on past sales because they constituted an "identifiable, future benefit . . . reflective of past services," he could not recover "career credits" because they constituted "future compensation for future services'"). Consequently, according to Abiomed, Suzuki had not earned any of the incentive shares stipulated in the Offer Letter at the time he was released from the company and, therefore, he was ineligible to receive the 20,000 shares of stock. D. 11 at 9; see King v. Mannesmann Tally Corp., 847 F.2d 907, 908 (1st Cir. 1988) (explaining that plaintiff "failed to show that the commissions were earned, even though not yet payable at the time of his termination").

But Abiomed's argument ignores the "bad faith" component of Suzuki's claim. While the Supreme Judicial Court never expressly defined the term "bad faith," it did explain that bad faith exists, for example, where the "principal seeks to deprive the agent of all compensation by terminating the contractual relationship when the agent is on the brink of successfully completing the sale." Fortune, 373 Mass. at 104-05. It further explained that courts apply the doctrine "to prevent overreaching by employers and the forfeiture by employees of benefits almost earned by the rendering of substantial services." Id. at 105.

Thus, while Abiomed cites Harrison v. NetCentric Corp., 433 Mass. 465, to support its motion to dismiss, its reliance on that case is not persuasive in light of Suzuki's allegations in this case. In Harrison, the plaintiff was an at-will employee whose employee stock options were

subject to a periodic vesting schedule. Id. at 473. At the time the plaintiff's employment was terminated, forty-five percent of his shares had vested and the remaining fifty-five percent were contingent on him continuing to provide his employer services. Id. at 473-4. The plaintiff sued for breach of implied covenant of good faith and fair dealing, arguing that he had accepted the position for a lower salary than he otherwise would have without the stock options and that he had fully expected to be retained at least until his stock had fully vested. Id. at 472-73. The Harrison court affirmed the lower court's dismissal of the claim, holding that the employer "did not deprive the plaintiff of any income that he reasonably earned or to which he was entitled." Id. at 473. Rather, "shares vested over time only if he continued to be employed; thus, the unvested shares [were] not earned compensation for past services, but compensation contingent on his continued employment." Id. In sum, the court determined that the plaintiff's unvested shares did not represent compensation that he had earned. Id.

The facts in Harrison, however, are distinguishable from the facts that Suzuki alleges. While the plaintiff in Harrison was subject to a periodic vesting schedule that issued a percentage of his stocks at discrete intervals pursuant continued employment, Suzuki's shares were to be issued upon meeting specified benchmarks that he worked toward. The First Circuit has explained that there is a difference between these two stock option set-ups, noting that "ordinarily, a colorable periodic vesting schedule crudely delineates the line between past and future services." Sargent v. Tenaska, Inc., 108 F.3d 5, 9 (1st Cir. 1997). In other words, "[w]here benefits such as shares of stock are subject to a vesting schedule over time and vest only if the employee continues to be employed, such benefits are contingent on the employee providing future services for the employer and thus are generally not compensation for past services." Aggarwal v. Nexabit Networks, Inc., No. CIV.A. 99-6174, 2001 WL 34032503, at *8 (Mass. Super. May 30, 2001). Here, the Court

declines to apply Harrison to the facts alleged here given that the Harrison court was presented with a periodic vesting schedule that provided a defined line between past and future services. Suzuki's allegations here differ as they amount to an argument that, at least as alleged, Suzuki was coming to the brink of effectuating the events that would have triggered the additional share issuance and Abiomed, anticipating same and the great value those shares would hold, terminated him in bad faith so those events would not be realized.

Nor is Abiomed's reliance on King v. Mannesmann Tally Corp., 847 F.2d at 907, availing. There, the plaintiff was part of a team seeking to have Digital Equipment Corporation ("Digital") purchase defendant's printers. Id. Under plaintiff's contract, he would receive fifty percent of his commission at the time an order of printers was booked and the remaining fifty percent would be allocated once the printers shipped. Id. Plaintiff was able to get Digital to name defendant as its vendor and his employment was subsequently terminated. Id. Sometime thereafter, Digital purchased some of defendant's printers. Id. Plaintiff brought a claim for breach of the implied covenant of good faith and fair dealing, arguing he was owed compensation for the printer sales between defendant and Digital. Id. The First Circuit affirmed the lower court's dismissal of the claim, stating "[plaintiff's] claim for commissions essentially rests on his role in getting the [defendant] named as Digital's vendor of line printers. Massachusetts caselaw requires, however, that the commissions to which an at-will employee claims entitlement be clearly related to the employee's past service." Id. at 908. Under the commission plan, plaintiff was not entitled to commission simply for getting Digital to select defendant as its vendor. Id. Instead, his commission was tied to Digital's eventual ordering of printers from defendant. Id. Given these facts, the First Circuit found that plaintiff "essentially is seeking recovery for the loss of future

12

income which is insufficiently reflective of his past services; i.e., he has failed to show that the commissions were earned, even though not yet payable at the time of his termination." Id.

Here, unlike in King and in light of the liberal reading of Suzuki's allegations as is required at this stage in litigation, there exists at least a plausible link between Suzuki's past work and his expectation of receiving the shares promised to him under the Offer Letter. Suzuki's work was performed with the goal of getting Japanese regulatory authorities to approve Impella for general use, which was eventually granted following his termination and, as he alleges, would have occurred earlier if he had not be terminated.

The facts as alleged in the complaint more closely mirror those presented in Cataldo v. Zuckerman, 20 Mass. App. Ct. 731 (1985). There, a construction supervisor brought a claim against his employer, a developer, asserting that the developer had deprived him of a share of the developer's equity in certain construction projects. Id. at 735. The supervisor's contract had outlined that he would own a portion of the developer's equity in two named projects and in future projects. Id. at 733. After some of the projects in which the supervisor had an interest had already begun—but before they were completed—the developer attempted to change the agreement. Id. at 735. The supervisor refused to agree to any new agreement terms and he was subsequently terminated. Id. The Massachusetts Appeals Court held that the supervisor's unvested interest in real estate development projects "was sufficiently an identifiable, future benefit . . . reflective of past services'" to support a claim for a breach of the implied covenant of good faith and fair dealing. Id. at 741 (quoting Gram, 391 Mass. at 334)). The court concluded that the supervisor's interest in future projects was a "continuing inducement" to work for his employer and constituted "compensation for that continuing work." Id. at 740 (noting that the "[a]ctual realization by [the supervisor] of the value of any share of the developer's equity was for the future, of course, but

13

ownership of the possibility was intended to be and was part of [the supervisor's] day-to-day compensation for work currently being done"). Abiomed argues that Cataldo does not help Suzuki because the underlying agreement in that case failed to include a condition precedent for the plaintiff to gain an ownership share in future projects. D. 22 at 4-5. That is not persuasive here. Indeed, implied in the agreement in Cataldo was the notion that the supervisor would still be employed at the time the construction projects were completed. Cataldo, 20 Mass. App. Ct. at 740. Only then would equity transfer to the supervisor. Similarly, while Suzuki's actual realization of any value of the shares promised to him under the Offer Letter could only take place in the future, those shares served as a "continuing inducement" to work toward getting the Impella line approved in Japan and they functioned a part of Suzuki's "day-to-day compensation" for the work he performed. See id.

In sum, Abiomed may be accountable to Suzuki for unpaid compensation if it turns out he was terminated in bad faith and the compensation is connected to work already performed. Suzuki has pled sufficient facts to make out at least a plausible claim that Abiomed attempted to sidestep the contractual terms of the Offer Letter by firing Suzuki as soon as it became apparent that he would likely be entitled to a significant share issuance. As such, the motion to dismiss Count I is DENIED.

> **B.  Suzuki's Promissory Estoppel and Quantum Meruit Claims (Counts II and III) Survive**

Suzuki has also brought claims against Abiomed under theories of promissory estoppel (Count II) and quantum meruit (Count III). D. 1 ¶¶ 89-98. In general, to plead a promissory estoppel claim under Massachusetts law, Suzuki must allege that: (1) Abiomed made an unambiguous promise which it should have reasonably expected to "induce action or forbearance of a definite and substantial character" on the part of Suzuki; (2) the promise "induce[d] such

14

action or forbearance;" and (3) "injustice can be avoided only by enforcement of the promise." Neuhoff v. Marvin Lumber & Cedar Co., 370 F.3d 197, 203 (1st Cir. 2004) (applying Massachusetts law) (citation and quotations omitted); R.I. Hosp. Trust Nat. Bank v. Varadian, 419 Mass. 841, 848 (1995). In terms of the quantum meruit claim, Massachusetts law requires that Suzuki allege the following: (1) he conferred a reasonable benefit upon Abiomed; (2) Abiomed accepted the services with the reasonable expectation of compensating Suzuki; and (3) Suzuki provided the services with the reasonable expectation of receiving compensation. See Bolen v. Paragon Plastics, Inc., 747 F. Supp. 103, 106–107 (D. Mass. 1990).

Abiomed argues that each count fails because both Suzuki and Abiomed agree that the Offer Letter is an express contract that governed their employment relationship. See D. 11 at 13; D. 16 at 20. In Massachusetts, promissory estoppel applies only in the "absence of an express contract." Northrup v. Brigham, 63 Mass. App. Ct. 362, 369 (2005). Similarly, "[r]ecovery in quantum meruit presupposes that no valid contract covers the subject matter of a dispute. Where such a contract exists, the law need not create a quantum meruit right to receive compensation for services rendered." Boswell v. Zephyr Lines, Inc., 414 Mass. 241, 250 (1993); see Bos. Med. Ctr. Corp. v. Sec'y of Exec. Office of Health & Human Servs., 463 Mass. 447, 467 (2012) ("[a] plaintiff is not entitled to recovery on a theory of quantum meruit where there is a valid contract that defines the obligations of the parties."). But at this early stage of the litigation, "[a] party may set out 2 or more statements of a claim . . . alternatively or hypothetically, either in a single count . . . or in separate ones" and "[i]f a party makes alternative statements, the pleading is sufficient if any one of them is sufficient." Fed. R. Civ. P. 8(d)(2). Suzuki alleges that the subsequent Nondisclosure Agreement "contain[ed] language suggesting that it superseded all prior agreements," including the terms of the Offer Letter. D. 1 ¶ 25. He maintains that if the Court were to determine that the

15

Nondisclosure Agreement superseded rather than complemented the Offer Letter, then bringing the promissory estoppel and quantum meruit claims may be necessary because he would otherwise be barred from seeking recovery under a theory of breach of the implied covenant of good faith and fair dealing. Id.; D. 16 at 20. The Court agrees. "[I]t is accepted practice to pursue both theories at the pleading stage." Lass v. Bank of Am., N.A., 695 F.3d 129, 140 (1st Cir. 2012). As discussed above, Suzuki alleges that he chose to work at Abiomed for a significantly reduced salary only after relying on the incentive compensation scheme outlined in the Offer Letter and that he was fired by Abiomed only after substantially completing his incentive goals so that Abiomed could avoid compensating him for his work. That is, as alleged, regulatory approval by Japanese authorities was inevitable and Suzuki would have been entitled to incentive shares had he not been terminated. The factual allegations outlined in the complaint give rise to at least plausible claims of promissory estoppel and quantum meruit. Since these claims will be in the alternative to the breach of implied covenant of good faith and fair dealing claim, the Court DENIES Abiomed's motion to dismiss as to both Count II and Count III at this juncture.

## VI. Conclusion

For the foregoing reasons, the Court DENIES Abiomed's motion to dismiss, D. 10.

**So Ordered.**

/s/ Denise J. Casper
United States District Judge