# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| _____ | ) | |
| | ) | |
| KEISUKE SUZUKI, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | Civil Action No. 16-12214-DJC |
| | ) | |
| ABIOMED, INC., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | |
| _____ | ) | |

## MEMORANDUM AND ORDER

**CASPER, J.**                                                         **January 4, 2019**

## I.    Introduction

Plaintiff Keisuke Suzuki ("Suzuki") has filed this lawsuit against Defendant Abiomed, Inc. ("Abiomed") asserting numerous claims, including the sole remaining claim for a breach of the implied covenant of good faith and fair dealing (Count I). D. 1; D. 18; D. 59 at 3, n.3. Abiomed has moved for summary judgment. D. 44. For the reasons stated below, the Court ALLOWS the motion. The Court DENIES Abiomed's motion to strike portions of the record, D. 71; D. 87, as moot.

## II.    Standard of Review

The Court grants summary judgment where there is no genuine dispute as to any material fact and the undisputed facts demonstrate that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "A fact is material if it carries with it the potential to affect the outcome of the suit under the applicable law." Santiago–Ramos v. Centennial P.R. Wireless Corp.,

217 F.3d 46, 52 (1st Cir. 2000) (quoting Sánchez v. Alvarado, 101 F.3d 223, 227 (1st Cir. 1996)).

The movant bears the burden of demonstrating the absence of a genuine issue of material fact.

Carmona v. Toledo, 215 F.3d 124, 132 (1st Cir. 2000); see Celotex Corp. v. Catrett, 477 U.S. 317,

323 (1986). If the movant meets its burden, the non-moving party may not rest on the allegations

or denials in her pleadings, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986), but "must,

with respect to each issue on which she would bear the burden of proof at trial, demonstrate that a

trier of fact could reasonably resolve that issue in her favor." Borges ex rel. S.M.B.W. v. Serrano–

Isern, 605 F.3d 1, 5 (1st Cir. 2010). "As a general rule, that requires the production of evidence

that is 'significant[ly] probative.'" Id. (quoting Anderson, 477 U.S. at 249) (alteration in original).

The Court "view[s] the record in the light most favorable to the nonmovant, drawing reasonable

inferences in his favor." Noonan v. Staples, Inc., 556 F.3d 20, 25 (1st Cir. 2009).

## III.    Relevant Factual Background

The following facts are drawn primarily from Abiomed's statement of undisputed facts, D.

46, Suzuki's response to Abiomed's statement of undisputed facts, D. 63, Suzuki's statement of

disputed material facts, D. 64, and supporting documents. The facts are undisputed unless

otherwise noted.

Abiomed is a publicly traded company that is a leading provider of temporary mechanical

circulatory support devices—also known as "heart pumps." D. 46 ¶ 1; D. 63 at 2. The specific

line of heart pumps that Abiomed develops, manufactures and markets is called "Impella." D. 46

¶ 1; D. 63 at 2.

Suzuki has worked as a manager or director in the medical device field since 1998. D. 60

¶ 2. From 1998 until 2006, he worked in Japan at Guidant Japan, K.K. ("Guidant"), a Japanese

subsidiary of a large medical device company. Id. In or about January 2007, Suzuki left Guidant

and established Kaye Suzuki Device Consulting, LLC ("Suzuki Consulting"), which provided consulting services to companies seeking to introduce medical devices into the Japanese market. Id. ¶ 3. One of Suzuki consulting's clients was Abiomed and Suzuki provided consultation services relating to its seeking approval in Japan of its Impella line of heart pumps. Id. ¶ 4.

## A. Terms of Suzuki's Employment and Compensation Package at Abiomed

From late 2009 to early 2010, Suzuki engaged in discussions regarding potential employment at Abiomed with Abiomed's CEO Michael Minogue ("Minogue"), its Vice President of Healthcare Solutions Andrew Greenfield ("Greenfield") and its head of Human Resources Frank LeBlanc ("LeBlanc"). D. 46 ¶¶ 3-4; D. 1 ¶ 13. Suzuki and the various representatives from Abiomed discussed his compensation package consisting of a combination of salary, bonuses, shares of Abiomed stock and potential commissions. D. 46 ¶ 3; D. 63 at 2-3. Suzuki related to Minogue and Greenfield that his annual earnings at Guidant and Suzuki Consulting were much greater than what Abiomed was offering, but that he would be willing to work at Abiomed for a lesser salary because "[h]opefully the equity [would be] huge to make this up." D. 64 ¶ 1; D. 60 ¶ 7; D. 60-2.

On April 1, 2010, Abiomed made a written offer of employment ("Offer Letter")[1] to Suzuki for the position of Vice President of Asia, reporting to Greenfield. D. 46 ¶ 6; D. 50-10; D. 63 at 3. The Offer Letter detailed Suzuki's annual salary, annual bonus potential and a commission opportunity. D. 46 ¶ 6; D. 50-10; D. 63 at 3-5. It also provided that "this letter shall not be construed as an agreement, either express or implied, to employ you for any stated term, and shall

---

[1] Abiomed sent a first offer letter to Suzuki on March 31, 2010 and a second offer letter on April 1, 2010. Because the two offer letters are "identical with respect to all provisions relating to compensation and terms of employment," the Court refers to the documents as the "Offer Letter." D. 46 ¶ 6; D. 63 at 3.

in no way alter Abiomed policy under which both you and the Company remain free to end the employment relationship at any time and for any reason." D. 50-10 at 4. Additionally, the Offer Letter reflected that Suzuki would be awarded up to 45,000 shares of Abiomed common stock, which would be contingent on meeting three milestones. D. 46 ¶ 7; D. 50-10; D. 63 at 3-5. Specifically, (1) a performance share of 10,000 shares of Abiomed's stock would issue upon the successful submission of an application to Japan's Pharmaceutical and Medical Device Agency ("PMDA") for Impella use in Japan; (2) a performance share of 20,000 shares of Abiomed's stock would issue when Japan's Ministry of Health, Labor, and Welfare ("MHLW") approved Impella for "general use"; and (3) a performance share of 15,000 shares of Abiomed's stock would issue "when Approval for targeted reimbursement level of Impella is gained." D. 46 ¶ 7; D. 50-10; D. 63 at 3-5. The Offer Letter further stated that the performance share awards "require that you continue to be employed by the Company on the date that any of these milestones are achieved . . . " and that "[o]nce approval is gained for Impella General Use in Japan and provided that you remain and are qualified to be employed in the Commercial leadership role, we will present to you a commission structure." D. 46 ¶ 7; D. 50-10; D. 63 at 3-5.

In response to the Offer Letter, Suzuki emailed Greenfield and LeBlanc with several follow-up questions. D. 46 ¶ 8; D. 50-12; D. 63 at 5. Among other things, Sukuzi asked:

> 3) What do you mean but [sic] 'General Use' of Impella? I can not [sic] predict what will MHLW approve as intended use. Our goal is to gain the same as CE [Conformité Européenne] mark which I am not sure if you can describe as General Use. But the risk is that it will be the same with present FDA [Food and Drug Administration] max of 6 hours . . . .

D. 46 ¶ 8; D. 50-12 at 3; D. 63 at 5. Greenfield responded to Suzuki's question: "3) An approved indication, could be FDA or CE type approval. Specifically not a clinical trial prior to approval." D. 46 ¶ 9; D. 50-12 at 2; D. 63 at 5. It is undisputed that "indication" in this context means a

"patient population [that] can be treated." D. 46 ¶ 9; D. 63 at 5-6. Abiomed also alleges that Greenfield verbally told Suzuki "general use" was "defined as the same type of approvals [Abiomed] had in the United States, which is from the FDA, as well as in Europe for what is called a CE mark, which were very broad, crossed our main indications for clinical, and in Europe was actually more specific, so it was a restricted [sic], but it was still a series of multiple . . . indications . . . ." D. 46 ¶ 9; D. 50-2 at 4-5. Suzuki acknowledges the conversation took place but could not recall its content. D. 50-1 at 46.[2]

After receiving the Offer Letter, Suzuki also emailed Matthew Fairshter, who was both a friend and an attorney to Suzuki, asking Fairshter to review the Offer Letter and provide his "personal legal advise [sic]." D. 46 ¶ 11; D. 50-13 at 2; D. 63 at 7. Fairshter responded the next day, advising Suzuki that:

> the stock awards need to be confirmed that they are fully vesting at time of award. You also need some interim period protection. What happens if you submit the application, and then it becomes apparent that you are going to achieve the stated ends of your employment, i.e. the approvals being sought? They can presently terminate you prior to the milestone being reached, and thereby preclude you from receiving the stock. This is a common problem when it comes to milestone arrangements.

D. 46 ¶ 11; D. 50-13 at 2; D. 63 at 7. Suzuki relayed the advice to Greenfield and LeBlanc and requested a three or six month interim protection period to get the equity if he were terminated without cause. D. 46 ¶ 12; D. 50-14 at 3; D. 63 at 8. LeBlanc responded Abiomed could not accommodate Suzuki's request because it was Abiomed's "process" to grant performance-based shares "only after the event has occurred, and only to active employees." D. 46 ¶ 13; D. 50-14 at

---

[2] Suzuki alleges Greenfield testified that he could not recall whether the meeting happened before or after Suzuki signed the Offer Letter. D. 63 at 6. However, Suzuki's cited proof (Greenfield Deposition at page 35) is absent from the record. See D. 62-3 at 3-4 (skipping from page 34 to page 36 of the Greenfield Deposition).

3; D. 63 at 8. Suzuki responded: "Fair enough. I had to ask." D. 46 ¶ 13; D. 50-14 at 2; D. 63 at 8. Suzuki signed the Offer Letter on April 2, 2010. D. 46 ¶ 16; D. 50-11 at 3; D. 63 at 10. When Suzuki signed the letter, the price of Abiomed's stock was $10.00 per share. D. 64 ¶ 30; D. 62 ¶ 2; D. 62-1. In an email drafted shortly before Suzuki signed the letter, Greenfield calculated the value of Abiomed's stock upon the completion of the three milestones at $20.00 per share and $25.00 per share. D. 64 ¶ 31; D. 62-3 at 5; D. 62-4.

On April 10, 2010, Suzuki signed an Employment, Nondisclosure, and Non-Competition Agreement (the "Nondisclosure Agreement"). D. 64 ¶ 10; D. 60 ¶ 29; D. 60-6. The Nondisclosure Agreement stipulated that Abiomed "may terminate [Suzuki's] employment without cause," but after six months of employment, it would give him twenty-eight days written notice of same. D. 64 ¶ 10; D. 60 ¶ 29; D. 60-6 at 1.

**B.** **Delays in Japanese Approval for Impella**

By March 31, 2011, Suzuki had met the first milestone under the Offer Letter by submitting the "Shonin Application" to the PMDA for pre-market approval for the Impella 2.5 and 5.0 pump devices. D. 46 ¶¶ 20, 22; D. 63 at 11. Pursuant to the Offer Letter, Abiomed issued Suzuki 10,000 shares of common stock. D. 46 ¶ 24; D. 63 at 12.

Between March 2011 and summer 2014, Suzuki and others on his team worked on answering questions from the PMDA relating to the Shonin Application. D. 46 ¶¶ 26-28; D. 63 at 13-14. Abiomed's progress in Japan was much slower than expected. D. 46 ¶ 29, 32; D. 63 at 14; D. 64 ¶ 32. Each party casts blame on the other for this lack of progress. Compare D. 46 ¶¶ 52, 55, 58, 59, 63-65, 68 n.35, 70 with D. 63 at 19, 52; D. 64 ¶¶ 60, 62-65, 68-70, 73; D. 60 ¶ 5; D. 60-1. Whatever the reason, according to Suzuki, the delays gave Abiomed "a reason to regret not having a temporal limitation in the Offer Letter," D. 64 ¶ 32, unlike Minogue's contract, which

provided for an equity incentive triggered upon Impella approval in Japan with a time limitation of December 31, 2015, id. ¶ 35.

## C.     The June 9, 2015 Abiomed Meeting with the PMDA

In early April 2015, Abiomed received confirmation that PMDA officials would meet with Abiomed representatives. D. 46 ¶ 81; D. 64 ¶ 84. Suzuki asserts that his "communications with upper level members of the PMDA brought about the meeting." D. 64 ¶ 84. Before the meeting, Bolt wrote that "[Abiomed] asked the meeting months ago and [the PMDA] said no. Them [sic] Kaye [Suzuki] went to Japan and talked to people within PMDA and now they said yes is my understanding." D. 64 ¶ 84; D. 60 ¶ 76; D. 70 at 49. Akio Sudo ("Sudo"), a Director on the Abiomed Japan team, called the meeting "exceptional" and explained to Bolt, Greenfield, and others at Abiomed that the PMDA usually does not have this type of meeting "to receive [] extra-explanation[s]" from applicants at this stage in the process. D. 64 ¶ 82; D. 60-25 at 4; D. 70 at 48. On April 23, Senior Vice President of Global Product Operations William Bolt ("Bolt") sent draft questions for submission to the PMDA to Suzuki, Greenfield and others, explaining: "[w]e are entering a very important phase as these questions will be answered in a meeting at the end of May in Japan and will leave us a road map one way or the other." D. 64 ¶ 56; D. 60 ¶ 74; D. 60-26 at 1; D. 70 at 33.

The meeting between Abiomed and the PMDA took place on June 9, 2015. D. 46 ¶¶ 82-83; D. 64 ¶ 86. Bolt led the preparation for the meeting with Suzuki's participation. D. 46 ¶ 83; D. 63 at 47. Bolt served as the main spokesperson for Abiomed at the meeting, but Suzuki was also present. D. 46 ¶ 84; D. 63 at 47.

There were at least three outcomes of the meeting worth noting here. First, the PMDA agreed that Abiomed would not need to conduct a human clinical study for the Impella. D. 64 ¶

86; D. 62-7 at 13.[3]  Before the meeting, according to Bolt, Abiomed's concern that the PMDA would require such a study was "still an overhang." D. 62-7 at 13.  Such a study could have required hundreds of subjects, cost millions of dollars and led to delays of five to seven years.  D. 64 ¶ 87; D. 62-7 at 15.  Second, the PMDA explained it would not require Abiomed to split its application into separate parts for the Impella 2.5 and 5.0, which had been a concern and, according to Bolt, "would have been a ton of work."  D. 64 ¶ 91; D. 62-7 at 11; D. 60 ¶ 119.  Finally, the PMDA clarified the scope of the remaining steps that Abiomed would have to take to gain approval for the Impella.[4]  According to Suzuki, the clarification of the remaining steps meant the PMDA had "made clear that it was prepared to approve the Impella," whereas Abiomed emphasizes (and Suzuki agrees) that "[n]o one from PMDA said it was guaranteed that it would be approved" at the meeting.  D. 64 ¶ 88; D. 46 ¶ 88; D. 50-1 at 131-132.

Overall, Suzuki felt the meeting "was very favorable to Abiomed" and that after the meeting he had executed "substantial performance regarding obtaining the MHLW approval for the Impella." D. 50-49 at 2; D. 63 at 52; D. 64 ¶ 86.  In support of his position, Suzuki relies upon Minogue's statements on Abiomed's August 4, 2015 earnings call.[5]  On the call, Minogue stated that the meeting had a "positive outcome," despite the fact that the additional required steps for approval would "likely delay [the] commercial rollout by three to five months."  D. 64 ¶ 90; D. 62-17 at 5.  Minogue also reflected that, following the PMDA meeting, the "new anticipated

---

[3] See D. 62-8 at 6 (correction of Bolt deposition testimony from "human study would be needed" to "human study would not be needed").

[4] Bolt testified that the meeting had a "positive outcome" because the PMDA "told us what was on their mind about the different areas that we had to close the gaps to get an approval."  D. 64 ¶ 89; D. 62-7 at 7.  Similarly, Greenfield testified that the meeting "confirmed all the work [Abiomed] had left to do."  D. 62-3 at 8.

[5] Abiomed has moved to strike the statements from the earnings calls from the summary judgment record. D. 87 at 6-7.  See, infra, Section V(A) for a discussion of the motion to strike.

approval [would] allow ABIOMED to launch [its] latest Impella 2.5 and 5.0 products, which includes [the] product enhancements around ease of use and liability." D. 62-17 at 5. Abiomed, however, emphasizes that at least nine items required completion after the meeting, including further testing specific to Japan. D. 46 ¶¶ 85, 87. Abiomed also notes that PMDA also rejected one of the indications for the Impella at the meeting. D. 46 ¶ 86. The parties dispute whether this indication was "core" to the Impella's "general use." Id.; D. 63 at 48. Finally, Abiomed points out that one week after the meeting, Suzuki expressed concern that the PMDA would "give up on Abiomed" if Abiomed failed to provide the necessary testing to Abiomed by the end of the year. D. 46 ¶ 91.

### D. Suzuki's Tenure at Abiomed

Suzuki worked at Biomed from 2011 until his termination in June 2015. Although the parties dispute Abiomed's motivation for his termination (Suzuki claiming that it was pretext for not paying him for the second milestone payment and Abiomed claiming that his management style was undermining the approval process for Impella), the following is undisputed.

On or about May 20, 2015, Greenfield met with Suzuki to deliver his performance review for the 2015 fiscal year. D. 46 ¶ 72; D. 64 ¶ 75. It was the first time Suzuki received an overall rating of one (marginal). Compare D. 50-27 (2011 Review), and D. 50-28 (2012 Review), and D. 60-30 (2013 Review), and D. 50-29 (2014 Review), with D. 50-30 (2015 Review). In Suzuki's own comment in the 2015 review, Suzuki wrote "Bottom line, was not able to gain approval," and rated himself a one for the goal of achieving approval. D. 46 ¶ 36; D. 50-30 at 3. During the meeting, Greenfield gave Suzuki a proposed amendment to the Offer Letter in the form of a letter entitled "Amendment to Offer Letter Dated April 1, 2010" (the "Proposed Amendment"). D. 46 ¶ 73; D. 50-43; D. 64 ¶ 75. The Proposed Amendment would have limited Suzuki's duties to

Japan, rather than all of Asia, and would have cancelled the remaining 35,000 performance shares that would be owed to him under the terms of the original Offer Letter. D. 46 ¶ 74; D. 50-43; D. 64 ¶ 76. Instead, Suzuki would receive Restricted Stock Units ("RSUs") in lower amounts and at significantly less value than the performance shares originally promised in the Offer Letter. D. 46 ¶ 74; D. 50-43; D. 64 ¶¶ 76. The Proposed Amendment also sought to put a temporal limitation on the milestones, stating that the milestones would have to be completed within 18 months. D. 50-43; D. 64 ¶ 77. Lastly, the Proposed Amendment provided that Suzuki's entitlement to future commissions following Japan's approval of Impella would be cancelled. D. 46 ¶ 74; D. 50-43; D. 64 ¶ 76. The Proposed Amendment would not have altered Suzuki's base salary. D. 50-43, D. 64 ¶ 79. Suzuki rejected the Proposed Amendment. D. 64 ¶ 77.

On May 22, 2015, Abiomed presented Suzuki with another proposal (the "Revised Proposed Amendment"). D. 46 ¶ 75; D. 50-44; D. 64 ¶ 78. The Revised Proposed Amendment changed the wording of the milestone respecting Impella approval, describing it as complete when "the MHLW approves the Impella 2.5 and 5.0 for urgent & emergent use in Japan." D. 50-44 at 2. Greenfield testified that the condition changed to "restricted approval so that it actually was an achievable milestone for Mr. Suzuki in this restricted role." D. 46 ¶ 76; D. 50-2 at 26-27. While keeping the 18-month temporal limitation, the Revised Proposed Amendment added a monetary cap on the value of the equity incentives, stating that "[t]he aggregate total value of all grant rewards may not exceed $500,000 USD." D. 50-44 at 3. The Revised Proposed Amendment would not have altered Suzuki's base salary. D. 50-44; D. 64 ¶ 79.

On May 26, 2015, Suzuki rejected the proposed changes. D. 50-45. He noted that the "whole purpose is not about needing to change after 5 years, but more about not wanting to keep the original deal between [him] and [Abiomed], as the value of the equity have risen far beyond

what the company foreseen [sic] at that time." Id. at 3. Moreover, he expressed that Abiomed's reasoning for altering the terms of the Offer Letter was obvious "as the company [did] not want to change [his] salary but only the equity and commission portion only." Id. In June, both before and after the June 9 meeting, Suzuki sent various emails to individuals outside Abiomed explaining that he had been "demoted" because he had not yet achieved Impella approval. D. 46 ¶¶ 97-98; D. 63 at 55. After the June 9 meeting, Suzuki sent an email to a cardiologist in Japan explaining that he was waiting for Abiomed to fire him. D. 46 ¶ 98; D. 63 at 55.

On June 17, 2015, Greenfield emailed Suzuki asking to meet the following day. D. 50-50. Greenfield told Suzuki that Suzuki would "need to decide whether [he] want[ed] to continue working with Abiomed" on the Impella regulatory process, "but on terms that [were] reasonable." Id.; D. 64 ¶ 92. In the same email, Greenfield stated that he disagreed with Suzuki's characterization of the Impella approval process as virtually guaranteed. D. 46 ¶ 94; D. 50-50. Greenfield predicted that "approval in the best of all possible worlds [was] many months away (likely well into 2016)." D. 46 ¶ 94; D. 50-50. Suzuki and Greenfield met the next day and Suzuki said he would not accept the terms of the Revised Proposed Amendment. D. 46 ¶ 95; D. 63 at 54. Greenfield confirmed that because of Suzuki's refusal, his employment was being terminated. D. 46 ¶ 95; D. 63 at 54. Abiomed asserts it terminated Suzuki for "good cause," D. 55 at 14, while Suzuki asserts that he was terminated without cause, D. 64 ¶ 92.[6]

_____

[6] Abiomed did not give Suzuki 28-days' notice of his termination under the Nondisclosure Agreement. D. 64 ¶ 93; see D. 60-6 at 1. After Suzuki filed this lawsuit, Abiomed's Vice President of Human Resources wrote to Suzuki and explained that "[w]hile Abiomed does not believe that such notice was due to [Suzuki] under the circumstances of [his] separation, it also does not believe that this warrants going down a path of a legal dispute." D. 62-2 at 1. Accordingly, Abiomed enclosed a check "equivalent to four weeks of the salary being paid to [Suzuki] as of the date of [his] termination." Id.

At the time of Suzuki's termination the price of Abiomed's common stock was $67.16 per share, D. 64 ¶ 95; D. 62 ¶ 2, such that the value of 20,000 shares was $1,343,200, D. 64 ¶ 95. At the time of Suzuki's termination, Abiomed had not obtained any form of approval for the Impella devices from Japanese regulators. D. 46 ¶ 102; D. 63 at 57-58.

### E.    **Impella Approval Process in Japan After Suzuki's Termination**

After the June 9 meeting, Abiomed's efforts to get this approval included preparing for and conducting biocompatibility tests, developing an engineering report to accompany the test results, communicating with Japanese regulators in response to their questions, revising and updating parts of Abiomed's prior application, preparing for and undergoing audits and conducting in-person meetings with regulators. D. 46 ¶¶ 108-111. Bolt attests that after Suzuki's termination, Abiomed submitted 24 additional documents to the PMDA prior to approval, totaling over 21,000 pages. D. 84 ¶ 6; D. 84-1. Abiomed also states that "a critical issue" arose in March 2016 that could have "jeopardize[d] the approval process." D. 46 ¶ 112.

Suzuki counters that the vast majority of the work that went into gaining approval for the Impella after his termination was fully completed or partially completed before he left. D. 64 ¶¶ 106-109. Suzuki's assertion is based on his review of Abiomed's Summary of Technical documents ("STED") that he obtained from the PMDA website.[7] D. 64 ¶ 106. The STED lists the tests Abiomed conducted on the Impella by year, and Suzuki calculates that of 141 Impella tests conducted and submitted to the PMDA before the 2016 approval, 121 had been completed before Suzuki's termination. D. 64 ¶ 106. Of the remaining twenty tests, Suzuki alleges seventeen were already identified and planned, with the protocol development either having been completed

---

[7] Abiomed has moved to strike Suzuki's review of the STED. D. 87. See, infra, Section V(A) for a discussion of the motion to strike.

or in progress, at the time of his termination.  Id.  Finally, of the remaining three, the necessity of two of them had already been determined during Suzuki's employment.  D. 64 ¶ 107.

On September 27, 2016, fifteen months after Suzuki was terminated, Abiomed received Japanese regulatory approval of its Impella 2.5 and 5.0 heart pumps for use for "drug resistant acute heart failure, such as cardiogenic shock."  D. 46 ¶ 103; D. 63 at 58.  According to Abiomed, as of August 2018, Abiomed still does not have approval for "general use" of the Impella in Japan, because use of the Impella is limited to specific patient populations.  D. 46 ¶ 106.

## IV.    Procedural History

Suzuki instituted this action on November 1, 2016.  D. 1.  On December 14, 2016, Abiomed moved to dismiss.  D. 10.  Shortly thereafter, Suzuki voluntarily dismissed the part of his breach of contract claim (Count I) that was based on Abiomed's alleged breaching of the Nondisclosure Agreement by failing to provide Suzuki 28-days written notice before terminating him, as well as the retaliation claim under the Massachusetts Wage Act, G. L. c. 149, §148A (Count IV).  D. 18. The Court denied Abiomed's motion to dismiss the remaining claims.  D. 24.  On July 13, 2018, Abiomed moved for summary judgment on all remaining claims.  D. 44.  Suzuki then voluntarily abandoned his claims for promissory estoppel (Count II) and quantum meruit (Count III).  D. 59 at 3, n.3.  The Court heard the parties on the remaining claim for the breach of the implied covenant of good faith and fair dealing (Count I) and took the matter under advisement.  D. 80.

## V.    Discussion

### A.    Abiomed's Motion to Strike

As a preliminary matter, Abiomed has moved to strike the following:  1) Suzuki's review of the STED and accompanying chart, 2) statements made in Abiomed's quarterly earnings calls,

as transcribed on the website seekingalpha.com, and 3) Suzuki's assertions in the summary judgment briefing that are argumentative or consist of improper characterizations. D. 87.

First, as to Suzuki's STED analysis, Abiomed argues that the STED Suzuki relies upon is inadmissible because it is written in Japanese, is not the final version submitted to the PMDA and contains errors and missing dates. Id. ¶¶ 1, 4. Abiomed's counsel also attests that when Suzuki produced the chart—along with nearly 1500 additional documents after Suzuki's deposition had concluded—Abiomed's counsel responded by proposing either to continue Suzuki's deposition to address the additional documents or to agree not to use them in summary judgment briefing. D. 73 ¶¶ 4-6. Abiomed's counsel further attests that Suzuki's counsel agreed not to use the documents in response to a motion for summary judgment. Id. ¶ 6. Second, as to the quarterly earnings calls, Abiomed argues that the transcripts are unauthenticated and therefore inadmissible. D. 87 ¶ 13. Abiomed does not argue the transcripts are inaccurate. Finally, as to Suzuki's argumentative statements, Abiomed points to examples of unsupported statements and statements that lack foundation or personal knowledge in Suzuki's statement of disputed facts, Suzuki's response to Abiomed's statement of undisputed facts and Suzuki's affidavit in support of his opposition to summary judgment. Id. ¶¶ 18-20.

Under Fed. R. Civ. P. 56, "[a] party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2); see OFI Int'l, Inc. v. Port Newark Refrigerated Warehouse, No. 2:11-cv-06376 (WJM), 2015 WL 140134, at *1 (D.N.J. Jan. 12, 2015) (construing motion to strike summary judgment evidence as an objection under Rule 56(c) because "[f]ollowing the 2010 amendments to Rule 56, a motion to strike is no longer a proper means of attacking the admissibility of summary judgment evidence"). The First Circuit has explained that under Rule 56, "evidence that is inadmissible at

trial, such as inadmissible hearsay, may not be considered on summary judgment." Noviello v. City of Boston, 398 F.3d 76, 84 (1st Cir. 2005) (internal citation and quotation marks omitted).

The Court has reviewed the record in this case and has not credited any unsupported statements for the purposes of resolving the motion for summary judgment. With respect to the STED and accompanying chart and the transcripts of Abiomed's quarterly earnings calls, the Court has also considered them in light of Abiomed's objections and Suzuki's statements in support. The Court concludes that even without striking this contested evidence, as explained below, no trier of fact could reasonably resolve the claim for breach of the covenant of good faith and fair dealing in Suzuki's favor. The Court, therefore, DENIES Abiomed's motion to strike as moot.

**B.     The Covenant of Good Faith and Fair Dealing**

Suzuki brings a claim against Abiomed for breach of the implied covenant of good faith and fair dealing. D. 1 at ¶¶ 72-88. "Under Massachusetts law, '[e]very contract implies good faith and fair dealing between the parties to it.'" Young v. Wells Fargo Bank, N.A., 717 F.3d 224, 237 (1st Cir. 2013) (alteration in original) (quoting T.W. Nickerson, Inc. v. Fleet Nat. Bank, 456 Mass. 562, 569 (2010)). The implied covenant provides "that neither party shall do anything that will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." Anthony's Pier Four, Inc. v. HBC Assocs., 411 Mass. 451, 471 (1991) (quoting Druker v. Roland Wm. Assocs., Inc., 370 Mass. 383, 385 (1976)) (internal quotation marks omitted). This "guarantee[s] that the parties remain faithful to the intended and agreed expectations of the parties in their performance." Uno Rests., Inc. v. Bos. Kenmore Realty Corp., 441 Mass. 376, 385 (2004).

Traditionally, an at-will employment contract like Suzuki's[8] is one that, by its express terms, may be terminated by either party without reason. Fortune v. Nat'l Cash Register Co., 373 Mass. 96, 100 (1977). Nevertheless, an employer may be liable for a breach of the implied covenant of good faith and fair dealing when it terminates an at-will employee in certain circumstances. See id. at 104. Where termination occurs for the purpose of depriving the employee of benefits or compensation due or forthcoming at the time of discharge, the termination is considered to have been rendered in "bad faith" and the covenant is, therefore, considered to have been breached. Id. at 104-05 (the "Fortune doctrine"). A breach of the covenant of good faith and fair dealing may also occur where an employer terminates an employee without "good cause" thus "depriv[ing] the employee of clearly identifiable future compensation reflective of the employee's past services." Gram v. Liberty Mut. Ins. Co., 391 Mass. 333, 335-36 (1984) (the "Gram doctrine").

For compensation to be considered "due" to an employee under Fortune/Gram and its progeny, the Supreme Judicial Court has said the employee must have been "on the brink" of achieving a qualifying milestone, Fortune, 373 Mass. at 105, that the compensation was "fairly

---

[8] Suzuki alleges that he was not an at-will employee, D. 1 ¶ 77; D. 59 at 2, n.2, but the undisputed evidence indicates that he was an at-will employee as Abiomed contends, D. 55 at 7, n.4. The Offer Letter provided that "both you and the Company remain free to end the employment relationship at any time and for any reason." D. 50-10 at 4. The Nondisclosure Agreement echoed this provision, again providing for termination "without cause," but adding that, after six months of employment, Abiomed would give Suzuki 28-days written notice of same. D. 60-6 at 1. The 28-day notice provision, however, does not take Suzuki out of the realm of at-will employment. See Fortune, 373 Mass. at 103 (citing RLM Assocs. v. Carter Mfg. Corp., 356 Mass. 718, 718 (1969) (characterizing an employment relationship as at-will where either party could terminate the employment with thirty days' notice)); see also Fernandez-Fernandez v. Municipality of Bayamon, 942 F. Supp. 89, 94 (D.P.R. 1996) (concluding that a contractual provision that allowed either party to terminate with ten days notice "can only be interpreted to mean that this is a contract which is terminable at-will by either party"). Accordingly, the Court analyzes Suzuki's claim as an at-will employee.

earned and legitimately expected" by the employee, <u>Maddaloni v. W. Mass. Bus Lines, Inc.</u>, 386 Mass. 877, 884 (1982), or that the compensation was "clearly connected to work already performed" by the employee, <u>Harrison v. NetCentric Corp.</u>, 433 Mass. 465, 473 (2001) (citing both <u>Fortune</u> and <u>Gram</u>).  The purpose of the doctrine is "to prevent overreaching by employers and the forfeiture by employees of benefits almost earned by the rendering of substantial services." <u>Fortune</u>, 373 Mass. at 105.

The <u>Fortune/Gram</u> exception to the employment at will doctrine is not without limitation. <u>Ayash v. Dana-Farber Cancer Inst.</u>, 443 Mass. 367, 385 (2005), <u>cert denied sub nom. Globe Newspaper Co. v. Ayash</u>, 546 U.S. 927 (2005).  It is well established that "[t]he covenant 'may not . . . be invoked to create rights and duties not otherwise provided for in the existing contractual relationship.'"  <u>Laudano v. 214 S. St. Corp.</u>, 608 F. Supp. 2d 185, 195 (D. Mass. 2009) (quoting <u>Liss v. Studeny</u>, 450 Mass. 473, 477 (2008)).  In other words, "[t]he scope of the covenant is only as broad as the contract that governs the particular relationship."  <u>Ayash</u>, 443 Mass. at 385.

Based on the <u>Fortune/Gram</u> doctrine and Suzuki's status as an at will employee, to defeat summary judgment, he must, at least, have provided sufficient evidence of a genuine dispute of fact that he was terminated for the purposes of depriving him of compensation that was due to him, that he was "on the brink" of achieving of a milestone of earning, or that was fairly earned and legitimately expected for work already done.  Although Abiomed spends a fair amount of time contending that they otherwise had "good cause" to terminate Suzuki and Suzuki has argued that Abiomed had otherwise exhibited "bad faith" in terminating him, the key issue is whether such termination of an at-will employee was done for the purpose of depriving Suzuki of compensation that he was due or on the brink of having due to him.  Since the Court concludes, based upon the

undisputed record as to this issue, that Suzuki was not denied compensation due him or that was on the brink of being due to him as explained below, the Court need not reach these other matters.

To defeat summary judgment, Suzuki must show that he was "on the brink" of reaching the second milestone, Fortune, 373 Mass. at 105, or that the 20,000-share equity incentive was a benefit he had "fairly earned and legitimately expected." Maddaloni, 386 Mass. at 884. This requirement exists because the implied covenant of good faith and fair dealing cannot be breached where the compensation sought is not "reflective of past services." McCone v. New England Tel. & Tel. Co., 393 Mass. 231, 235 (1984) (quoting Gram, 391 Mass. at 334) (noting that in Gram, the Supreme Judicial Court had "held that, while the employee could recover renewal commissions on past sales because they constituted an 'identifiable, future benefit . . . reflective of past services,' he could not recover 'career credits' because they constituted 'future compensation for future services'").

In support of Abiomed's arguments that the equity shares in the second milestone were not "fairly earned and legitimately expected" by Suzuki, Abiomed compares Suzuki's case to the one presented in Coll v. PB Diagnostic Sys., Inc., 50 F.3d 1115 (1st Cir. 1995). In Coll, the Court rejected a former CEO's claim that he was terminated to avoid payment of nearly $1 million under a long term incentive plan ("LTIP") because the plaintiff's "own writings indicate[d] that two of the four goals of the LTIP would not be met, and that there was no potential for payout in 1992 under the LTIP . . . ." Id. at 1125. At the time of plaintiff's termination, the company's Board had also concluded that the LTIP "appear[ed] unlikely to produce incentive compensation payments under the Company's present business forecasts." Id. Similar to Coll, the second milestone was not achieved at the time of Suzuki's termination nor was it achieved, even in part, until over a year after his termination.

Abiomed also cites <u>King v. Mannesmann Tally Corp.</u>, 847 F.2d 907 (1st Cir. 1988). In <u>King</u>, the plaintiff was part of a team seeking to have a corporation ("Digital") purchase defendant's printers. <u>Id.</u> at 907. Under plaintiff's compensation plan, he would receive fifty percent of his commission at the time an order of printers was booked and the remaining fifty percent would be allocated once the printers shipped. <u>Id.</u> Plaintiff was able to get Digital to name defendant as its vendor and Plaintiff's employment was subsequently terminated. <u>Id.</u> at 907-08. The vendor contract did not obligate Digital to purchase printers, but rather set out the terms for any prospective orders that might occur. <u>Id.</u> at 908. Sometime thereafter, Digital purchased some of defendant's printers. <u>Id.</u> Plaintiff brought a claim for breach of the implied covenant of good faith and fair dealing, arguing he was owed compensation for the printer sales between defendant and Digital. <u>Id.</u> The First Circuit affirmed the lower court's dismissal of the claim, stating "[plaintiff's] claim for commissions essentially rests on his role in getting the [defendant] named as Digital's vendor of line printers. Massachusetts case law requires, however, that the commissions to which an at-will employee claims entitlement be clearly related to the employee's past service." <u>Id.</u> Under the commission plan, plaintiff was not entitled to commission simply for getting Digital to select defendant as its vendor. <u>Id.</u> Instead, his commission was tied to Digital's eventual ordering of printers from defendant. <u>Id.</u> Given these facts, the court ruled that plaintiff "essentially is seeking recovery for the loss of future income which is insufficiently reflective of his past services; *i.e.*, he has failed to show that the commissions were <u>earned</u>, even though not yet payable at the time of his termination." <u>Id.</u> (emphasis in original).

Abiomed also cites <u>Getz v. Image Stream Med., Inc.</u>, Civ-11-1101-L2 (Super. Ct. Oct. 15, 2012); D. 55-1, with similar facts to those in <u>King</u>. In <u>Getz</u>, the plaintiff was an at-will salesperson selling technological products to hospitals. D. 55-1 at 2-3. Getz was paid an annual salary and

had the opportunity to earn commissions.  Id. at 3.  Under the "Commission Plan" laid out in Getz's employment contract, Getz would be paid commissions "pro rata upon receipt of customer payment."  Id.  In March 2008, Getz's company learned it would become a vendor on a project for a client for whom Getz had served as the primary contact and had met with in person to solicit business.  Id. at 5.  Getz was terminated in April 2008 for poor performance.  Id. at 4.  Like in King, the vendor agreement did not obligate the client to make purchases from the company.  Id. at 5.  The client subsequently hired one of the company's competitors to fulfill some of the needs described in the vendor contract.  Id.  As a result, Image Stream had to adjust its quotes to the client and the sale did not occur until August 2008.  Id. at 5-6.  Like in King, Getz sued his employer for a breach of the covenant of good faith and fair dealing and sought to recover the commission for the August sales.  The court granted summary judgment in favor of the employer, concluding that as a matter of law, the commission Getz sought was not "based on work that [was] related to his past services."  Id. at 11.

Finally, Abiomed relies upon Gerald Rosen Co., Inc. v. Int'l Tel. & Tel. Co., 16 Mass. App. Ct. 929 (1983).  In Gerald Rosen Co., the court reversed judgment for a plaintiff employee for unpaid future sales commissions and granted judgment to the defendant employer that had terminated the plaintiff without paying those commissions.  Id. at 929.  The plaintiff had built up defendant's sales over thirteen years and argued that he had created an expectation of future sales and resulting commissions off those sales.  Id.  The court explained "the fact that [the sales representative's] efforts may have augmented the prospect for future orders [did] not bring its situation within the ambit of" either Fortune or Gram.

In denying the motion to dismiss, in light of the liberal pleading standard that was then applicable, the Court held that the facts of this case mirrored those of Cataldo v. Zuckerman, 20

Mass. App. Ct. 731 (1985). In Cataldo, a construction supervisor brought a claim against his employer, a developer, asserting that the developer had deprived him of a share of the developer's equity in certain construction projects. Id. at 735. The supervisor's contract had outlined terms under which the supervisor would own a portion of the developer's equity in two named projects and in future projects. Id. at 733. After some of the projects in which the supervisor had an interest had already begun—but before they were completed—the developer attempted to change the agreement. Id. at 735. The supervisor refused to agree to any new agreement terms and he was subsequently terminated. Id. The Massachusetts Appeals Court held that the supervisor's unvested interest in real estate development projects "was sufficiently an 'identifiable, future benefit . . . reflective of past services'" to support a claim for a breach of the implied covenant of good faith and fair dealing after he was terminated without being paid for the unvested interest. Id. at 741 (quoting Gram, 391 Mass. at 334). The Appeals Court concluded that the supervisor's interest in future projects was a "continuing inducement" to work for his employer and constituted "compensation for that continuing work." Id. at 740 (noting that the "[a]ctual realization by [the supervisor] of the value of any share of the developer's equity was for the future, of course, but ownership of the possibility was intended to be and was part of [the supervisor's] day-to-day compensation for work currently being done"). Abiomed argues, among other things, that Cataldo does not help Suzuki because Cataldo did not expand the scope of the interests protected by the implied covenant of good faith and fair dealing to allow for recovery where the termination is "so attenuated" from any later events that could have given rise to compensation. D. 55 at 20-21.

At the motion to dismiss stage of this litigation, the Court accepted Suzuki's allegation as true that he had "fairly earned and legitimately expected" the equity associated with the second milestone, as was required at that juncture where the standard is whether Suzuki's allegations are

merely plausible.  See D. 24 (discussing King and Cataldo and plausibility standard that applied when the Court considered the motion to dismiss).  Suzuki's burden at summary judgment, however, is greater.  Although Suzuki has offered abundant contentions, he has put forward no legal arguments concerning the merits of his case as it relates to the post-Fortune and Gram case law.  See generally D. 59 at 7-18.

Considering the now fully developed record, the Court concludes that like the employees in King, Getz, and Gerald Rosen Co., Suzuki was not "on the brink" of achieving the second milestone when he was terminated, nor was the 20,000 share equity incentive "fairly earned and legitimately expected."  Even viewing the facts in the light most favorable to Suzuki, it is undisputed that Abiomed took significant additional steps to secure the 2016 Impella approval in Japan during the fifteen months after Suzuki was terminated.  According even to Suzuki's own analysis of the final 2016 PMDA submission, multiple tests were completed after Suzuki's termination and before the 2016 approval.  Abiomed also submitted 24 additional documents to the PMDA about the Impella, totaling over 21,000 pages, during the same time period.  D. 84 ¶ 6; D. 84-1.  Moreover, the passage of fifteen months between Suzuki's termination and the 2016 Japanese Impella approval undermines any temporal connection between his efforts and the ultimate result that Abiomed achieved.  See Doherty v. Donahoe, 985 F. Supp. 2d 190, 203 (D. Mass. 2013) (holding that a twenty-month gap between employee complaint and alleged retaliation "eviscerate[d] any temporal connection" between the two events); see also Calero-Cerezo v. U.S. Dep't of Justice, 355 F.3d 6, 25 (1st Cir. 2004) (noting that "three and fourth month periods have been held insufficient to establish a causal connection based on temporal proximity").

The Court further concludes that based on the fully developed record at this point in the litigation, Cataldo does not serve to defeat summary judgment.  The Court agrees with Abiomed

that if Cataldo were operative as to the undisputed facts material to this issue here, Suzuki's position would result in him being entitled to the equity incentive regardless of when Japan granted Impella approval and regardless of how much work had been done to secure that approval after Suzuki's termination. Such an expansive view of the Fortune/Gram doctrine would stretch it impermissibly beyond what the Supreme Judicial Court had already held was "the limit" of recovery allowed under the doctrine, Gram, 391 Mass. at 335.

Given that Suzuki was not due compensation for a milestone that was not achieved at the time of his termination and was not achieved until fifteen months later[9] after considerable additional effort by Abiomed, such that it cannot be reasonably concluded that he was "on the brink" of reaching this milestone, Abiomed's termination of Suzuki does not amount to bad faith or violation of the implied covenant of good faith and fair dealing. At trial, "[t]he burden of proving bad faith or unfair dealing" would fall on Suzuki, as the employee. Kravetz v. Merchs. Distribs., Inc., 387 Mass. 457, 462 (1982). Because Suzuki would bear the burden for this issue at trial, at summary judgment, he must "demonstrate that a trier of fact could reasonably resolve that issue in [his] favor." Borges ex rel. S.M.B.W. v. Serrano–Isern, 605 F.3d 1, 5 (1st Cir. 2010). This is not a case as in Fortune "[w]here the principal seeks to deprive the agent of all compensation by terminating the contractual relationship when the agent is on the brink of successfully completing the sale, the principal has acted in bad faith and the ensuing transaction between the principal and [the third party] is to be regarded as having been accomplished by the agent." Fortune, 373 Mass. at 104-05. It is also not in the case as in Gram where "[a]lthough there

---

[9] The Court recognizes that Abiomed disputes whether the second milestone for approval "for general use" was even achieved at this point and that the parties dispute the meaning of general use, D. 68 at 7, but the Court need not resolve this matter because it is undisputed that no approval, for general use or otherwise, was achieved until fifteen months after Suzuki's termination.

is no evidence warranting an inference that [the employer] discharged [the employee] for the purpose of appropriating his renewal commissions, the fact remains that [the employee] lost reasonably ascertainable future compensation based on his past services." <u>Gram</u>, 384 Mass. at 671.[10]

## VI.   Conclusion

For the foregoing reasons, the Court GRANTS Abiomed's motion for summary judgment, D. 44.  Abiomed's motion to strike, D. 87, is DENIED as moot.

**So Ordered.**

/s/ Denise J. Casper
United States District Judge

---

[10] The Court is in receipt of the parties' positions on the covenant of good faith and fair dealing as recently addressed by the Massachusetts Appeals Court in <u>Biewald v. Seven Ten Storage Software, Inc.</u>, 94 Mass. App. Ct. 376 (2018), D. 90-94, and concludes that <u>Biewald</u> is consistent with the Court's opinion in this matter.